No. 28,997.

CARROL CAPPS, a Minor, etc., *Appellee*, v. A. B. CARPENTER, *Appellant.*

(283 Pac. 655.)

Opinion filed January 11, 1930.

*A. H. Carl,* of Pittsburg, and *John A. Hall,* of Pleasanton, for the appellant.

*C. S. Denison, E. V. Bruce, Carrie S. Denison,* all of Pittsburg, and *S. H. Allen,* of Topeka, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by Carrol Capps, a minor,

against A. B. Carpenter, for damages for personal injury inflicted by Carpenter's minor son, Joe Carpenter. Plaintiff recovered, and defendant appeals.

Carpenter permitted Joe to have and use a spring gun. It was of the size, weight and appearance of the familiar "air gun," but the missile, a steel shot BB size, was expelled by a spring compressed by a lever and released by a trigger. In target shooting the shot would penetrate a paper put on a post for the target. Sometimes a shot would dent the wood. Sometimes a shot would bury in the wood—texture of the wood and distance of the gun from the target not stated. The gun was not a firearm, did not belong to any branch of the weapon family, and was used for diversion and amusement. Because such articles are called "guns," boys who receive them as gifts become persons of importance to themselves and their playmates; but compared to guns, they are toys.

At the time of the injury Carrol was nearly seven years old and Joe was eight. The boys were sitting in a porch swing at the Carpenter home. Carrol screamed, jumped out of the swing, and ran home. He had sustained an injury to his right eye. The petition pleaded that Joe was not only mischievous, but was also cruel, treacherous, selfish, arbitrary, domineering, and prone and inclined to impose upon, chastise, and inflict punishment on his playmates and associates near his own age; that Joe's father knew or should have known Joe's disposition and habits; that, nevertheless, Joe's father gave him a dangerous agency, the gun. The petition also contained the following:

"That on or about the 16th day of July, 1927, this plaintiff, as a playmate of defendant's said minor son, was sitting in a lawn swing on defendant's premises, conversing with said defendant's said minor son. That said defendant's son had said air gun in his hands while so sitting in said swing, as aforesaid. That said defendant's minor son thereupon and while in said swing, pointed said air gun at this plaintiff, and told this plaintiff to 'stick 'em up,' and further said, 'you turned my rabbit out, and I'm going to shoot your eye out.' Thereupon defendant's said son pointed said air gun at plaintiff's right eye, shot plaintiff in said right eye with said gun, . . ."

At the trial Carrol testified substantially in the language of the petition. A girl scrubbing the porch of a house next to the house directly across the street testified she heard Joe say "I'm going to shoot you," and testified Carrol jumped out of the swing "hollering with his eye, said he shot him in the eye."

There was no dispute that the swing was four feet long, its seat was sixteen inches deep, and the swing hung by chains from the

porch ceiling and tilted easily. Joe said Carrol had the gun when he was hurt, Joe was watching a boy on the street, and he did not know how Carrol got hurt. When produced at the trial, the end of the gun barrel was split, so that two angular corners were slightly exposed. There was evidence that the gun was in the same condition as it was when the injury occurred, but there was some evidence indicating the spring and trigger of the gun might have been removed after the injury. Joe was sitting on the right side of Carrol when Carrol was injured. The gun itself is approximately three feet long. Joe was in the habit of using the gun, and the proof was that he shot left-handed because his right eye was crossed.

Plaintiff neglected to call as a witness the physician who treated Carrol's eye, or any other witness to prove the nature of the wound. Called by defendant, the physician testified the eye was cut by a piece of metal, or something which would cut, and the wound could not have been caused by a BB shot or bullet of any kind. The wound healed in the ordinary way, and the cut, which was about seven-sixteenths of an inch long, was such that it would leave a scar. At the request of the court, the physician looked at Carrol's eye, and testified he could still see the cut across the eye. He said, "You can see the scar now." No witness, lay or expert, disputed the physician's testimony, unless Carrol did, who, when describing the occurrence, said, "It kinda blew my eye out on my cheek."

In order to show that Joe was a boy who would likely inflict bodily harm, testimony of specific acts was introduced, and in order to show that Joe's father knew or should have known he was a boy who would likely inflict bodily harm, testimony of his general reputation was introduced.

The court instructed the jury as follows:

"11. You are instructed that if you find from the evidence in this case that about July 1, 1927, the defendant, A. B. Carpenter, gave his minor son, Joe Carpenter, a dangerous agency or weapon commonly known as an air gun, said gun being designed to and it did shoot, with great force and violence, shot and bullets, and permitted his minor son to use said air gun in and about his home and neighborhood where said defendant and minor son resided, and you further find that at the time of giving said dangerous agency or weapon to his minor son he knew, or had knowledge either express or implied, that his minor son was mischievous, treacherous, selfish, arbitrary, domineering, and inclined to impose upon, chastise and inflict punishment upon his playmates and associates of about his own age, and knowing the disposition and habits of his minor son, permitted his said minor son to use said dangerous weapon in and about his home and neighborhood where said defendant and

his minor son resided, such acts and conduct on the part of the defendant A. B. Carpenter would be negligence, and he would be liable to respond in damages for any injury that resulted therefrom."

The jury returned special findings of fact:

"Q. 1. Was A. B. Carpenter present at the time the injury occurred? A. Not in person.

"Q. 3. State the act of negligence on the part of A. B. Carpenter which resulted in the injury. A. By giving his son a dangerous weapon commonly known as an air gun.

"Q. 4. Did A. B. Carpenter consent to the act by Joe Carpenter which caused the injury? Yes, by implied consent.

"Q. 5. By what word or act did A. B. Carpenter express his consent that Joe Carpenter do the act which caused the injury? A. Negligent act, by giving him the gun.

"Q. 6. Was Joe Carpenter under the direction and control of A. B. Carpenter at the time of the injury? A. Yes, by implied control."

The court should not have permitted the subject of dangerous agency to go to the jury. The gun was not a dangerous agency, and defendant's negligence did not consist in giving his son a dangerous agency, as the jury found. The gun was just what it was in the hands of the dealer who sold it, and in the hands of Joe's father, and was just what it would have been in the hands of an experienced hunter. A boy's sword of lath can injure an eye, and innumerable toys and house and garden and farm articles, utensils and implements are capable of inflicting serious bodily injury. That does not make them dangerous instrumentalities. In order to lay a foundation for liability of a father for accident occurring while his minor son was driving the father's automobile, some courts said an automobile is a dangerous instrumentality. That view is generally rejected as unsound; and to call a chattel, not in its nature normally destructive and reasonably certain to imperil life or limb, a dangerous instrumentality because it may be misused, confuses the issue in negligence cases.

When a chattel is itself a dangerous thing, probable harm from its use is foreseeable, and precaution must be taken accordingly. When probability of harm depends on the immaturity, incompetence, inexperience, recklessness or ferociousness of the person to whom a chattel is given for use, quite a different issue is presented. The person receiving the chattel is the dangerous agency.

In this instance Joe had shot at targets with his father. He had shot at trees and at birds. Witnesses for plaintiff said they had seen him shoot the gun in the neighborhood, in the street, in the

alley, and between houses. He shot at birds in the yard of a woman living a block from the Carpenter home. There were a number of children in the neighborhood who played with Joe. He was the only boy who had a gun. He was in the habit of having the gun when playing with the children. Joe said they played soldier, and he carried the gun as a soldier gun, while the others carried sticks. This continued for a considerable period of time, at least from June until the time of the accident. Parents of the children who played with Joe knew he had the gun when playing with their children. One witness testified she heard Joe say to other children he would shoot them. She did not say what the occasion for the statement was, whether he said it in play or in anger, or whether the gun was in condition to shoot. Apparently no child was kept away from Joe because he was in the habit of playing with the gun, and no witness testified of complaint to defendant or Mrs. Carpenter because Joe had the gun. Joe knew just what the gun could do, and told the jury what it could do. He was not charged with carelessness or with incompetence in the use of the gun. He was charged with intentionally shooting at his playmate's eye, which he hit. The result is, the issue in the case was not nature of the chattel, but whether Joe had such a malignant disposition that he would likely shoot some playmate if he had a gun, and his father knew or from known facts should have known of that disposition. Unless the boy had such a disposition, and the father knew or from known facts should have known he had such a disposition, the father was not guilty of negligence in permitting the boy to have the gun.

It is plain from the special findings that the verdict was the product of the dangerous-agency concept. It was not disputed that Carpenter was in Oklahoma when the injury occurred, but the jury would not frankly say he was not present and Joe was not under his control while Joe was in the act of shooting Carrol. The gun became a dangerous "weapon," and because Carpenter gave Joe a dangerous weapon, he was not only negligent, but he impliedly consented that Joe might shoot his playmate in the eye.

The fact that Joe had a malignant disposition, likely to manifest itself in the infliction of bodily harm on playmates with the gun, was provable by instances of manifestation of the disposition. Such evidence puts a defendant at a disadvantage, because he cannot be prepared in advance to meet it, and the evidence raises collateral issues which may be as difficult of solution as the main issue.

Therefore, single instances should be strictly relevant, and should have marked significance. In this case, evidence of trivial instances of rough behavior, likely to be manifested by one or more members of any group of children, was admitted, over objection of defendant.

A woman testified she saw Joe sneak up behind the little Capps boy and slap him and run, and saw Joe snatch a stick out of the Capps boy's hand and run. Another woman said she saw the children taking turns in the swing, and Joe would pull others out so he could have more turns than the others, and he would not get out when his turn was ended, and would slap the other children. Another woman said she heard Joe tell a boy he could lick him. Margaret Bridgewater lived near the Carpenters from February to November. She had a daughter Margaret, eight years old. Margaret would go to the Carpenter house to play. Joe generally chased her back, and called her names. Mrs. Bridgewater was not near enough to hear what names Joe called Margaret, and could not tell any names he called Margaret. Joe chased Margaret back about every time she went down the street, and one day Joe hit Margaret in the back with a rock three inches across, in front of Joe's own home and in daylight. Mrs. Bridgewater testified, however, as follows:

"My little girl did not play with Joe Carpenter all of the time, but she played like other children in the neighborhood. There were quite a number of children in the neighborhood, and they all played together, and they all played together before the little Capps boy got hurt, and they all played together after the little Capps boy got hurt, and played together up to the time I moved away from there. When the little Carpenter boy would chase my little girl home, she would be back down there in a little while, and they played together there all summer. She played with a couple of other little girls there, and with the little Capps boy, and Joe Carpenter, and Joe Carpenter also played with the other little girls and the little Capps boy, and up to the time I moved away from there, Joe Carpenter was playing with all of those children my child played with. . . . At the time Joe Carpenter was out there shooting the rifle, my little girl was with him . . ."

This testimony shows how much anxiety Mrs. Bridgewater felt that Joe might hurt Margaret, whether he had a gun or not; and there was no testimony by anybody that Joe Carpenter ever really hurt any child he played with, before the accident.

Joe's reputation for possessing a malignant disposition, likely to make it dangerous to other children for him to be intrusted with the gun, was pertinent to show his father knew or should have known

of the disposition. A witness was permitted to say, however, that Joe had the reputation of being "mean among other children." Witnesses were asked concerning Joe's reputation as to being "cruel or domineering," and "cruel and domineering." The witnesses were those who had detailed the petty, paltry "cruelties" which have been recited. Whether Joe was domineering or arbitrary or selfish or inclined to impose on other children, or had such a reputation, had nothing to do with the case. Likewise, whether he was cruel and inclined to chastise and inflict punishment on other children, and had such a reputation, was not important, unless the propensities and reputation went far beyond "being mean among other children."

In the case of *Edwards v. Crume*, 13 Kan. 348, the syllabus reads:

"Where a minor son who lives with his father and is under his father's control commits certain wrongful acts, but where the said acts have not been authorized by the father, are not done in his presence, have no connection with the father's business, are not ratified by the father, and from which the father receives no benefit, the father is not liable in a civil action for damages for such wrongful acts." (¶ 1.)

In the case of *Baker v. Morris*, 33 Kan. 580, 7 Pac. 267, the syllabus reads:

"Where a minor son negligently and carelessly shoots and kills a mare belonging to another, the father, who had no connection with the transaction, directly or indirectly, proximately or remotely, is not liable." (¶ 1.)

In the case of *Smith v. Davenport*, 45 Kan. 423, 25 Pac. 851, plaintiff sued a parent for damages for personal injury sustained when a pony ridden by defendant's minor son, Albert, ran against plaintiff. The pony did not belong to defendant, but it was kept on his premises. In the afternoon Albert borrowed the pony to look for strayed stock, and about sundown returned it. Later Albert went on foot to the home of a neighbor to inquire after the neighbor's health. Albert's younger brother and another boy rode the pony to the neighbor's house, and dismounted. Albert then got on the pony, and while riding at a gallop the pony suddenly changed its course, and ran against plaintiff. The father did not send Albert to the neighbor's house, and did not know he had gone there. The syllabus reads:

"A father is never liable for the wrongful acts of his minor son, unless the acts are committed with the father's consent or in connection with the father's business."

In the case of *Mirick v. Suchy*, 74 Kan. 715, 87 Pac. 1141, a de-

murrer was sustained to a petition seeking to recover damages from a parent resulting from a fire set by his minor son. In the opinion it was said:

"It is conceded that the father is not liable for the tortious acts of his sons by reason simply of the relationship, nor by reason of their minority, nor because they lived at home with him and worked for him and were under his care, management and control.

. . . . . . . . . . . . . .

"The liability of a parent for the act of a minor son rests upon the same basic facts as the liability of a master for the acts of his servant, and does not result from the fact of the tort or act being purposely or willfully done, but from its being done in doing the master's or parent's business." (pp. 716, 717.)

These cases were all well decided, and they all illustrate nonliability of a parent for torts of his minor child. Attempts, however, to state a universal rule of nonliability, as in *Smith v. Davenport*, are likely to fail, and may confuse.

A doting parent reluctantly consents that his beseeching minor child may drive the parent's automobile for the child's own personal pleasure, and the parent knows, or has reason to know, the child will likely undertake to drive on a city street crowded with pedestrian and vehicular traffic. Because of known lack of discretion and experience in driving, the child is unfitted to manage the automobile in such traffic, and he has an accident. It is idle to say the parent consented to the act which caused the injury. It is equally idle to say the automobile was used in the parent's business. The parent, however, is subject to liability, not because of his relation to the automobile as owner, or because of his relation to the child as parent, but because of his own negligence—because of not taking reasonable precaution against an injurious result which he could well foresee. The same would be true if the child were a neighbor's child, or if the borrower were an adult who, as the lender knew or had reason to know, could not, for lack of experience, or because of recklessness, or intoxication, be trusted to drive the automobile. In this instance the alleged disqualification of the child was savagery.

Because of error in the admission of testimony and in the instructions to the jury, the judgment of the district court is reversed, and the cause is remanded for a new trial.

JOCHEMS, J., not participating.