No. 79,546

ALICE F. LONG, *Appellant*, v. STEVEN L. TURK, *Appellee.*

(962 P.2d 1093)

Opinion filed August 19, 1998.

*Jerry R. Palmer,* of Palmer, Lowry & Leatherman, of Topeka, argued the cause, and *LJ Leatherman,* of the same firm, was on the briefs for appellant.

*Thomas E. Wright,* of Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, of Topeka, argued the cause, and *Evelyn Zabel Wilson,* of the same firm, was with him on the brief for appellee.

*Gary D. White, Jr.,* of Schroer, Rice, P.A., of Topeka, was on the brief for *amicus curiae* Kansas Trial Lawyers Association.

*Kelly W. Johnston,* of Johnston Law Offices, P.A., of Wichita, and *Dennis A. Henigan,* of Legal Action Project, of Washington, D.C., were on the brief for *amicus curiae* The Center to Prevent Handgun Violence.

The opinion of the court was delivered by

Six, J.: This is a summary judgment appeal by a parent, as plaintiff, seeking to impose civil liability on a handgun owner for the death of the parent's son. The claim arises from the fatal shooting of Alice Long's son, Tony, by defendant Steven Turk's son, Matthew. Both boys were minors. Tony was killed by a hollow point bullet from a .357 Magnum handgun owned by Steven Turk.

Jurisdiction is under K.S.A. 20-3018(c), a transfer from the Court of Appeals on our motion.

The issues are:

(1) Does the inherently dangerous instrument doctrine require an owner of a .357 Magnum handgun to exercise the highest degree of care in safeguarding it?

(2) Did the district court err in granting summary judgment for the defendant father?

The answer on both issues is, "yes." We reverse the summary judgment.

## FACTS

Matthew, age 17, was driving his car in Topeka around 9:30 p.m. on October 18, 1994. He knew it was illegal to carry a concealed weapon in the car. He encountered a van in which Tony, also 17, was a passenger. A shouting match followed. After driving side-by-side for a few blocks, the van turned. Matthew followed. He reached under the floor mat of his car, pulled out his father's .357 Magnum handgun, and fired one shot out the passenger side window. The hollow point slug went through the back window of the

van, killing Tony. Matthew was tried as an adult and convicted of involuntary manslaughter.

At the time of the shooting, Matthew, who lived with his parents, was 37 days short of his 18th birthday. Matthew's father, Steven, owned many guns, which were locked in a gun safe. (The .357 Magnum was registered in Steven's wife's name although Steven bought it and his wife never used it.) Matthew knew where the keys to the safe were. He had access to all his father's guns. The .357 Magnum was in a hidden compartment of a cabinet. The compartment was secured by 2-½ inch screws. Matthew helped his father build the compartment. The .357 Magnum and the hollow point bullets were in the same cabinet.

There is conflicting evidence in the record about whether Matthew took the gun without his father's permission or whether his father gave him the gun for protection. Matthew, in his deposition here and at his criminal trial, testified that: (1) he took the gun when his parents were not home and (2) he was not supposed to take the gun without his father's permission.

Police and expert witness reports from the criminal case attached to Matthew's deposition, however, suggest that: (1) Steven had given Matthew permission to use the gun for protection on previous occasions, (2) the handgun had been provided for him for protection by his family as part of the security system the family believed was necessary because of the neighborhood conditions where they lived, and (3) Steven knew Matthew was carrying a handgun for his own protection as people had been bothering him.

Steven objects to consideration of the reports on appeal, contending that they are not affidavits and were not adopted by Matthew. Long counters that the reports were exhibits attached to the deposition and the district court referred to facts contained in the reports in making its ruling.

The district court's Memorandum Decision and Order says in part:

"While defendant [Steven Turk] had not given Matthew permission to carry the gun on the day in question, *he regularly gave him permission to carry it on other*

*occasions.*[1] *He did so believing that his son needed protection given the level of crime activity in their neighborhood.*[2] (Emphasis added.)

During Matthew's deposition, he was asked to read a report of his examination by Dr. R.E. Schulman, a clinical and forensic psychologist. Counsel for Long instructed Matthew: "You can stop reading when it gets down to collateral contacts. The rest is his analysis. What I'm trying to cover is your information you gave to him."

The questioning continued:

"Q. Okay. Now, did you look over [the Schulman] report?
"A. Yes, I did.
"Q. Is there anything in the report where you didn't tell the truth to the doctor that you can tell?
"A. No. Those—I don't believe those are my exact words. Those are like his summary of our, you know, times together."

At this point counsel for Steven objected to the form of the question and said:

"[The Schulman report and a report from William S. Logan, M.D.] are both in juvenile court proceedings to determine whether [Matthew] should be tried as an adult. I'll make my objection for the record. We'll deal with it later."

Dr. Schulman said in the PRESENT CIRCUMSTANCES section of his report referencing the date of the fatal shooting:

"[Matthew] noted, too, that on the previous day when he had been working on his automobile, people had bothered him and frightened him while he was at his own home. Under the seat of his car was a revolver. The revolver had been provided for him for protection by his family. This was part of the security system that the family believed was necessary because of the circumstances surrounding their home as described above. He did take the revolver and discharge it in the direction of the van. Apparently shooting through the open passenger side window of his vehicle."

---

[1] On the day in question, Matthew obtained the gun he used to shoot Tony Long by unscrewing the bottom of the gun cabinet and removing the gun from the bottom compartment. This leads to the factual questions as to whether Matthew had permission to use the gun at all, and whether you could keep a gun out of a minor's hands when they are willing to go to such extreme measures to obtain the gun. The Court does not resolve these questions because the Court finds them irrelevant to the ultimate legal question.

[2] While this fact was not argued by the parties, *"the record submitted to the Court contained numerous references to this fact."* (Emphasis added.)

Matthew was cross-examined by his father's counsel using Dr. Logan's report. (Section F is labeled "Mr. and Mrs. Turk (Matthew's parents.)" Section F says, in part:

"At the police station Officer Young spoke with Mr. and Mrs. Turk. Mr. Turk knew his son was carrying a gun for his own protection as people had been bothering him. They said they lived in a rough neighborhood and that he needed it for protection. They knew Matt was proficient with the firearm and practiced with the weapon on occasion 'but described him as a very good boy and one who took care of them.' (See report of Officer Young)."

The objection to the reports was never ruled on. No objection to the reports was made in the summary judgment submission Steven presented to the district court. The reports marked as deposition exhibits were in the record before the district court and indirectly referenced in the district court's decision. They are in the record on appeal.

Alice Long alleges in her amended petition that Steven Turk was responsible for the death of her son

"as the owner of the handgun in question and/or the ammunition used in this shooting because,
    "(a) He failed to properly secure the weapon and/or the ammunition;
    "(b) He was negligent in his instruction of Matthew Turk with respect to the use of weapons;
    "(c) He failed to take adequate safeguards to keep Matthew away from both this gun and/or the ammunition after Matthew had been apprehended with a sawed-off shotgun in his possession."

Steven and Matthew were deposed. Steven moved for summary judgment.

## The District Court Opinion

The district court granted summary judgment for Steven relying on *Capps v. Carpenter,* 129 Kan. 462, 283 Pac. 655 (1930), and Restatement (Second) of Torts § 308 (1964). The district court said, in part:

"From *Capps* and the Restatement, it is clear that it is not enough that defendant allowed his son to carry one of his guns in order to find liability on part of the defendant. Instead, from Matthew's past or from his disposition, it must have been clear to defendant that it was foreseeable that Matthew was likely to

use the gun to commit a tort against another. Anything less results in no liability on the part of defendant for the acts of his son.

"Because Matthew had no previous violent tendencies, nor had he shown any likelihood that he would 'use the thing in such a matter as to create an unreasonable risk of harm to others,' there is no liability on the part of defendant for entrusting a gun to his son. Consequently, defendant is entitled to summary judgment."

Alice Long appealed. The Center to Prevent Handgun Violence of Washington, D.C., and the Kansas Trial Lawyer's Association have filed *amicus curiae* briefs. Both *amicus* briefs support and supplement Long's contentions.

## DISCUSSION
### Inherently Dangerous

Initially, we ask, does the inherently dangerous instrument doctrine, as Long contends, require an owner of a .357 Magnum handgun to exercise the highest degree of care in safeguarding it? We characterize this inquiry as the centerpiece of Long's appeal.

Long submits handgun statistics and reprints from published materials to persuade us that handguns are inherently dangerous. We are invited by the parties to review gun/death/injury civil cases from other jurisdictions. See Annot., 68 A.L.R. 2d 782, and Later Case Service, 67-69 A.L.R. 2d, p. 234.

We have no difficulty concluding that a .357 Magnum handgun is a dangerous instrumentality. The highest degree of care is required in safeguarding such a handgun. Even Steven, in advancing the argument that strict liability does not apply here, quotes *Wroth v. McKinney*, 190 Kan. 127, 129, 373 P.2d 216 (1962), for the position that

"liability for keeping a dangerous instrumentality is not an absolute liability so as to make the defendant an insurer . . . , but that liability for negligence in respect to dangerous instrumentalities, as liability for negligence, generally arises from the failure to use due care."

We have characterized certain instrumentalities, *i.e.*, explosives, gas distribution systems, electrical transmission lines, and firearms, to be inherently dangerous. Heightened care in their safekeeping is required. See *Cope v. Kansas Power & Light Co.*, 192 Kan. 755,

391 P.2d 107 (1964) (a high voltage wire); *Sternbock v. Consolidated Gas Utilities Corp.*, 151 Kan. 81, 98 P.2d 162 (1940) (gas leaking from a utility's lines); *Clark v. Powder Co.*, 94 Kan. 268, 146 Pac. 320 (1915) (solidified glycerine explosive).

We turn now to our firearms cases. In *Wroth*, 190 Kan. 127, a plumber had, according to his custom and with the prior knowledge and acquiescence of the homeowner, taken his 4-year-old son along with him to work at the McKinney home. McKinney owned a loaded revolver that he kept in his bedroom in an easily accessible location. The plumber's child found the revolver and shot and killed himself.

In holding that a cause of action was stated against McKinney, we addressed liability for keeping a dangerous instrumentality, 190 Kan. at 129.

In *Wroth*, we summarized our position as follows:

"Kansas has long followed the rule that the highest degree of care is required of all responsible persons having ownership or control of dangerous explosives such as dynamite *and firearms*. [Citing *Clark v. Powder Co.*, 94 Kan. 268.] Under the Clark case the degree of care has to be commensurate with the dangerous character of the instrumentality and a duty to exercise the highest degree of care never ceases." 190 Kan. at 130. (Emphasis added.)

In *Wroth*, we cited the Restatement of Torts, Negligence § 308, comment b, p. 836 (1934) (190 Kan. at 130), the forerunner of Restatement (Second) of Torts § 308 (1964).

Section 308 of the Restatement (Second) of Torts (1964) provides:

"§ 308. Permitting Improper Persons to Use Things or Engage in Activities
It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others."

Comment b of the Restatement (Second) of Torts § 298 (1964) is also pertinent here. Comment b says, in part:

"Care required. The care required is always reasonable care. This standard never varies, but the care which it is reasonable to require of the actor varies with the danger involved in his act, and is proportionate to it. The greater the danger, the greater the care which must be exercised.

" . . . *Thus those who deal with firearms . . . are required to exercise the closest attention and the most careful precautions, not only in preparing for their use but in using them.*" (Emphasis added.)

See Prosser and Keeton, The Law of Torts § 34, p. 208 (5th ed. 1984).

The district court relied on *Capps v. Carpenter,* 129 Kan. at 463, a 1930 case involving a spring gun "of the size, weight, and appearance of the familiar 'air gun.' " *Capps* is not a dangerous instrumentality case. The defendant father in *Capps* allowed his 8 year-old son to have a BB gun. Carrol, a boy nearly 7 years of age, was shot in the eye. The BB gun "was not a firearm, did not belong to any branch of the weapon family, and was used for diversion and amusement." 129 Kan. at 463. The jury was instructed that the air gun was a "dangerous agency or weapon." 129 Kan. at 464. We reversed the plaintiff's recovery, holding that the subject of dangerous agency should not have gone to the jury. 129 Kan. at 465.

The injury in *Capps* occurred while the boys were sitting on a porch swing. The flavor of another era is found in the language of Justice Burch: "A boy's sword of lath can injure an eye, and innumerable toys and house and garden and farm articles, utensils and implements are capable of inflicting serious bodily injury. That does not make them dangerous instrumentalities." 129 Kan. at 465.

We acknowledged the nonliability of a parent for torts of a minor child in *Capps,* 129 Kan. at 469. *Capps,* however, after invoking an auto analogy of the "doting parent" consenting to the "beseeching minor child" to drive the parent's car, reasoned:

"The parent, however, is subject to liability, not because of his relation to the automobile as owner, or because of his relation to the child as parent, but because of his own negligence—because of not taking reasonable precaution against an injurious result which he could well foresee." 129 Kan. at 469.

*Parman v. Lemmon,* 119 Kan. 323, 244 Pac. 227 (1925), and *Parman v. Lemmon,* 120 Kan. 370, 244 Pac. 232 (1926), are gun cases of interest. Justice Mason's dissent in *Parman I,* 119 Kan. at 332, became the opinion of the court on rehearing in *Parman II,* 120 Kan. at 372-73. *Parman II* held that a 20-gauge Winchester

pump shotgun is not a dangerous weapon under R.S. 1923, 38-701 or R.S. 1923, 38-702 which prohibited possession of dangerous weapons by a minor. *Parman II* concluded that if the 1883 legislature had intended to include shotguns in the prohibited list of dangerous weapons, it would have specifically mentioned them. 120 Kan. at 372.

The 1920's pastoral hunting scene, described in *Parman I* and *II*, provides a stark contrast to the facts here. The boys in *Parman* were 14 and 16, hunting ducks on an October Sunday afternoon. William fired at a "hell-diver" (dabchick or grebe) on a small pond. Some of the shot glanced on the water, striking the 16-year-old plaintiff and putting out his eye.

The statutes involved in *Parman I* and *II* were R.S. 1923, 38-701 (prohibiting furnishing a pistol, revolver and other enumerated items as well as "other dangerous weapons" to a minor) and R.S. 1923, 38-702 (prohibiting a minor from possessing any items listed in 38-701). A conviction under either statute was a misdemeanor and resulted in a fine.

R.S. 1923, 38-702 and R.S. 1923, 38-701 were similar to the legislative expression in place in 1994 when Matthew killed Tony. Long does not rely on K.S.A. 21-4203(a)(1) to assert a private cause of action arising from the statute. However, K.S.A. 21-4203(a)(1) reflects the public policy of Kansas to restrict handgun access of persons under 18. It provides in part:

"(a) Criminal disposal of firearms is knowingly: (1) Selling, giving or otherwise transferring any firearm with a barrel less than 12 inches long to any person under 18 years of age."

K.S.A. 21-4204a provides in part:

"(a) Criminal possession of a firearm by a juvenile is knowingly possessing a firearm with a barrel less than 12 inches long by any person less than 18 years of age."

(Seven exceptions are listed. None apply here.) A conviction under either statute is a misdemeanor.

The parties are before us on summary judgment. We do not know if Steven knowingly gave or otherwise transferred the .357 Magnum to Matthew. Steven was not charged under K.S.A. 21-

4203(a)(1). The stories vary on Matthew's possession of the .357 Magnum the night Tony was killed. Steven's negligence, if any, will be decided by the trier of fact. The jury must assess Steven's conduct under all surrounding circumstances.

The legislative policy behind K.S.A. 21-4203 and 21-4204a supports our holding that Steven owes the public a duty to store his .357 Magnum in a safe and prudent manner, taking into consideration the type of handgun, where the ammunition is located, and the circumstances of the gun's use. See *Estate of Strever v. Cline,* 278 Mont. 165, 174-75, 924 P.2d 666 (1996).

A review of *Arredondo v. Duckwall Stores, Inc.,* 227 Kan. 842, 610 P.2d 1107 (1980), is appropriate as we look to the interplay of the criminal statutes K.S.A. 21-4203 and 21-4204a, and civil liability. *Arredondo* held that K.S.A. 60-258a (the comparative negligence statute) applies in a personal injury action where liability is based on a violation of K.S.A. 21-4209, which prohibits the sale of explosives to minors.

Arredondo, a 16-year-old, bought gunpowder from Duckwall Stores. He reloaded shotgun shells and was injured when the gun fired. In discussing the legislative intent behind K.S.A. 21-4209, we observed:

"In 1969, the firearms and explosives sections were grouped together in article 42 of chapter 21 as 'Crimes Against the Public Safety.' This placement and caption were the result of legislative action. The Judicial Council comment acknowledges the public safety purposes of the act. Sale or *transfer* of *either handguns* or explosives to *minors,* habitual drunkards, narcotic addicts, or recently convicted felons might result in injury to the purchaser or transferee, *but injury to the public seems more probable and is the more logical and compelling reason for the enactment of both the firearms* and the explosives *acts.* We cannot attribute the purpose of protecting minors, habitual drunkards, narcotic addicts, or felons from themselves as the impelling reason for this enactment; *the safety of the public— including minors and the other classes—is the paramount purpose."* (Emphasis added.) 227 Kan. at 847.

K.S.A. 21-4203 (giving or otherwise transferring a handgun to a minor) and K.S.A. 21-4204a (minor knowingly possessing a handgun) are located in the same Chapter 42.

A factual determination is required to decide whether the steps Steven took to safeguard the gun met the highest degree of care test.

## Foreseeability

We turn now to the foreseeability issue. We disagree with the district court in granting summary judgment for Steven on the ground that the harm caused by Matthew was as a matter of law not foreseeable.

Our summary judgment standard has been frequently expressed. All facts must be taken in the light most favorable to Long, who opposed summary judgment. See *Kerns v. G.A.C., Inc.*, 255 Kan. 264, 268, 875 P.2d 949 (1994). Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. K.S.A. 60-256(c). Our standard of review is de novo. See *Mark Twain Kansas City Bank v. Kroh Bros. Dev. Co.*, 250 Kan. 754, Syl. ¶ 2, 863 P.2d 355 (1992).

The district court properly assumed handgun entrustment in the light most favorable to Long—that Steven had entrusted the .357 Magnum to Matthew. This fact is disputed. (Steven contends Matthew unscrewed the hidden compartment and took the .357 Magnum without permission.) The district court noted that it did not reach the permission question because it found permission to be irrelevant to the ultimate legal question of foreseeability.

According to the district court, Matthew had not shown any likelihood that he would use the handgun in a manner creating an unreasonable risk of harm to others. We have held that whether risk of harm is reasonably foreseeable is a question for the trier of fact. Only when reasonable persons could arrive at but one conclusion may the court decide the question as a matter of law. *Nero v. Kansas State University*, 253 Kan. 567, 583, 861 P.2d 768 (1993). In *Nero*, we reversed summary judgment for the university. The issue was whether the university had a duty to protect residence hall students and, if so, the nature and extent of that duty. See also *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 362, 819 P.2d 587 (1991), on the issues of risk of harm and foreseeability.

Long contends that the record shows that Steven knew Matthew drank alcohol, had been stopped for an alcohol-related offense, and had taken and concealed Steven's sawed-off shotgun. Matthew was

involved in the shotgun incident in June 1993 while driving with three other teenage boys as passengers. (Tony was killed on October 18, 1994.) The car was stopped. A stolen stereo speaker was in the car. A sawed-off shotgun was found under the driver's seat, and Matthew admitted the shotgun belonged to him. The gun was taken by the authorities. Two shotgun shells were in the ashtray, and a third was loaded in the gun. Steven identified the shotgun as his but did not realize Matthew had removed it.

A month later Matthew was arrested for the alcohol-related offense while driving again with teenagers. Open containers were found in the car. He was placed on diversion. Matthew at age 14 had been arrested with two other youths who had attempted to start a fire on Burnett's Mound in southwest Topeka. Matthew had thrown a bottle of sulfuric acid against a wall at school a month before he killed Tony. We believe Matthew's past, when viewed in the light most favorable to Long, raises a disputed risk of harm foreseeability issue. Based on the record, the trier of fact should decide if it was foreseeable that Matthew would use the .357 Magnum to protect himself from the people who were bothering him. Reasonable persons could disagree whether Matthew's use of the .357 Magnum was foreseeable.

## Strict Liability and Proximate Cause

Two additional matters deserve comment. Long advocates adoption of the doctrine of abnormally dangerous activity as a form of strict liability for handgun owners. The position advanced is that entrusting a handgun to (or failing to prevent access to a handgun by) a minor is so dangerous and socially undesirable that imposition of the burden of strict liability is appropriate. We are asked to follow *Berry v. Shell Petroleum Co.,* 140 Kan. 94, 33 P.2d 953 (1934) (salt water damage to land); *Laterra v. Treaster,* 17 Kan. App. 2d 714, 844 P.2d 724 (1992) (suicide by automobile exhaust); *Mills v. Smith,* 9 Kan. App. 2d 80, 673 P.2d 117 (1983) (wild animals); and *Hahn v. Kordula,* 5 Kan. App. 142, 48 Pac. 896 (1897) (vicious dog). One aspect of Long's argument is the mounting evidence that handguns in the hands of teenagers pose a great risk to society.

The doctrine of abnormally dangerous activity/strict liability was not considered by the district court. We have reversed summary judgment. We need not extend our appellate reach to address strict liability under the facts here.

The issue of proximate cause is raised by Steven. He argues that the killing of Tony by Matthew was an intervening criminal act that excludes any of his negligence as a cause of Long's damages. Steven's contention on the proximate cause question is not well taken. See *Citizens State Bank v. Martin,* 227 Kan. 580, 588, 609 P.2d 670 (1980). Relying on Restatement (Second) of Torts § 448 (1964), *Citizens State Bank,* 227 Kan. 580, Syl. ¶ 5, says:

"One who has a duty to protect others, and who negligently breaches that duty, resulting in injury, is not excused by intervening innocent, negligent, intentionally tortious, or criminal acts of a third person."

Reversed and remanded.