(218 P.3d 446)
No. 101,015

KATHERINE PAIGE CANADAY, Personal Representative and Administratrix for the Estate of Robert Canaday, *Appellant*, v. MIDWAY DENTON U.S.D. No. 433, *Appellee*.

Opinion filed October 30, 2009.

*Rebecca M. Randles*, *Sarah A. Brown*, and *Daniel G. Curry*, of Randles, Mata, & Brown, LLC, of Kansas City, Missouri, for appellant.

*Michelle R. Stewart* and *Peter Maharry*, of Fisher, Patterson, Sayler & Smith, LLP, of Overland Park, and *Joel R. Euler*, of Euler Law Offices, of Troy, for appellee.

Before GREENE, P.J., GREEN and STANDRIDGE, JJ.

GREENE, J.: Robert Canaday appealed the district court's award of summary judgment against him on his claims against Midway Denton U.S.D. No. 433 (Midway) that he was sexually abused by Robert Baird, a counselor, coach, and teacher at Midway. He argued that the district court erred because there remained a genuine issue of material fact as to Midway's knowledge of Baird's predisposition to commit such acts. He also argued the district court abused its discretion in striking certain witnesses due to a belated amendment of his witness list. After this appeal was docketed, Canaday died and has been replaced by Katherine Paige Canaday, personal representative and administratrix for Canaday's estate (hereinafter Canaday). Concluding that the court's striking of some of Canaday's witnesses was an abuse of discretion and that there remained a genuine issue of material fact, we reverse and remand for further proceedings.

*Factual and Procedural Background*

Canaday alleges that from 1984 to 1988, while he was aged 12 to 17 years old and a student at Midway, Baird sexually abused him on as many as 100 occasions, employing various types of sexual contact. He filed his action against Baird and Midway in 2007, but Baird was dismissed from the action prior to the summary judgment proceedings at issue in this appeal. Following discovery, Midway filed a motion for summary judgment on the ground that Baird's acts toward Canaday were not foreseeable. The district

court ultimately granted the motion, concluding that mere rumors that were investigated and found to be unsubstantiated did not impart adequate notice to establish forseeability of harm.

As a part of its summary judgment ruling, the district court granted Midway's motion to strike several witnesses, including several fellow student witnesses and a former janitor who could testify that he observed clear evidence of the abuse and reported it to the district superintendent. Canaday timely appeals all of these rulings.

*Did the District Court Abuse Its Discretion in Striking Witnesses Due to Belated Amendment of Canaday's Witness List?*

Canaday argues the district court abused its discretion in striking key witnesses because counsel failed to amend his witness list to include these witnesses until after discovery had closed, the summary judgment briefs were filed, and the trial date had been set. Canaday asserts that the witnesses were known to the defendant, that the substance of their testimony was also known to the defendant, and that the belated amendment of the witness list was an oversight that did not prejudice the defendant. The witnesses include Jerry Sullivan, a former custodian who witnessed evidence of the abuse and reported it to the district superintendent, and several student witnesses who could testify to the level of information generally known about inappropriate conduct by Baird toward his students.

Generally, the admission of witness testimony and exhibits not previously disclosed is discretionary with the trial court, and we review such decisions for an abuse of discretion. Discretion is abused when no reasonable person would adopt the view of the trial court. *State Farm Fire & Cas. Co. v. Liggett*, 236 Kan. 120, 124, 689 P.2d 1187 (1984). The exercise of judicial discretion requires the judge "to have proper regard for what is just and fair under the existing circumstances and requires that he or she not act in an arbitrary or unreasonable manner." *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 142, 815 P.2d 72 (1991).

The timeline of discovery events related to this issue is critical to our analysis of Canaday's argument. The following events or deadlines are material:

October 8, 2007 - Per the case management order, counsel and parties were to exchange lists of *proposed* exhibits and witnesses.

October 9, 2007 - Canaday's original proposed witness and exhibit list is filed.

October 15, 2007 - Responses to written discovery due on or before this date.

November 5, 2007 - Canaday informs Midway that he believes Sullivan has relevant information.

November 20, 2007 - Canaday requests identification by Midway of certain students.

November 21, 2007 - Depositions of parties and fact witnesses to be completed per case management order.

November 30, 2007 - Canaday hand-delivers Sullivan affidavit reflecting potential testimony of Sullivan.

December 6, 2007 - Canaday reasserts request for student identification and threatens motion to compel.

January 8, 2008 - Midway discloses names of students requested by Canaday.

January 18, 2008 - Deadline for completion of all discovery.

January 28, 2008 - Midway files a motion for summary judgment.

June 13, 2008 - Canaday files an amended witness and exhibit list including Sullivan and student witnesses.

June 20, 2008 - Midway files a motion to strike the amended list.

June 26, 2008 - Canaday's pretrial questionnaire is filed, listing the disputed witnesses.

July 3, 2008 - Deadline for pretrial questionnaires to be filed.

July 10, 2008 - Motion for summary judgment is granted.

July 11, 2008 - Court's scheduled date for pretrial conference.

July 18, 2008 - Court's scheduled deadline for dispositive motions.

September 8, 2008 - Court's scheduled date for jury trial.

In striking the disputed witnesses, the district court made the following findings and conclusions:

"9. The Court is of the opinion that the belated attempt to add additional fact witnesses is out of time and improper.

"10. Plaintiff admits he knew of Jerry Sullivan at the latest November 11, 2007, and knew of Steve Becker, Scott Elder, Joseph Underwood, and James Albers by January 8, 2008. However, Plaintiff failed to identify these individuals as their witnesses until June 13, 2008.

"11. There was no request to extend discovery as to fact witnesses at the November 30, 2007 hearing and no request to amend witness list at any time. The identification of these additional witnesses came after the objections by the Defendant [to] the affidavit of Jerry Sullivan in Plaintiff's opposition to Defendant's motion for summary judgment.

"12. The delay is improper and unjustified. It is also prejudicial. Defendant had every reason to rely on Plaintiff's witness list. It is reasonable to assume that if Plaintiff has not identified a witness that they will not be called to testify at trial.

"13. The delay frustrates discovery and puts the trial date at risk. This could have been avoided if Plaintiff timely identified these individuals upon discovery.

"14. The purposes of a case management order is to allow the Court to set dates and deadlines for the orderly administration of a case. A list of witnesses allows discovery to be focused on witnesses to be called at trial.

"15. If the Court allowed amendment to the list of witnesses it would render the case management order meaningless.

"16. The presentation of this issue at this late stage in such close proximity to the pretrial and the trial contributes to the Court's decision to grant Defendant's motion to strike Plaintiff's amended witness and exhibit list."

Canaday argues that the defendant was not prejudiced by the amendment of the witness list because it had been fully and timely advised of all information about these witnesses. Canaday further asserts that the defendant withheld the names of the student witnesses until a motion to compel was threatened and should not be heard to complain about lack of timeliness. Moreover, Canaday argues that the failure to amend the list was a mere oversight and that any violation of the case management order was merely "technical." Finally, Canaday argues that the importance of these witnesses—especially Sullivan—magnifies the prejudice to him by reason of the district court's order to strike.

We begin by acknowledging that the district court may control the course and schedule of pretrial activities through a case management order that may include "exchanging information on the

issues of the case, including . . . witness identification." K.S.A. 2008 Supp. 60-216(b)(3). Obviously, the district court may, in its sound discretion, take reasonable steps to enforce any and all aspects of such a case management order pursuant to K.S.A. 2008 Supp. 60-216(e) and (f), but the statutory scheme recognizes a distinction between the "order following a final pretrial conference" and any prior pretrial orders, in that the former may be modified only by "agreement of the parties or by the court to prevent manifest injustice," but the latter may be modified "by a subsequent order." This distinction has been recognized by our court and may be a determinative factor on issues related to enforcement. See, *e.g.*, *Gates v. Goodyear*, 37 Kan. App. 2d 623, 630-31, 155 P.3d 1196 (2007). If "manifest injustice" is the standard to modify the final pretrial order, something less than manifest injustice must be shown to modify prior case management orders.

Here, the district court entered two case management orders during the course of this litigation. In the first such order, dated August 8, 2007, the court specified that "[c]ounsel or the parties will exchange lists of *proposed* exhibits and witnesses. The list of witnesses shall set forth the address of each witness, the subject matter, and a brief synopsis of the substance of the facts to which each witness is expected to testify . . .by October 8, 2007." (Emphasis added.) In the second such order, dated November 30, 2007, there appears no specific mention of a deadline for proposed witness identification, but "[a]ll orders in the [prior order], not modified or altered by this order, shall remain in force and effect." Our search of the record reveals no order requiring a "final" witness list, other than the practice to include such a list in the pretrial questionnaire, which was not due until July 3, 2008. Canaday's pretrial questionnaire, which was timely filed, listed the disputed witnesses.

Where the case management order has provided no specified date for a "final" identification of witnesses prior to pretrial procedures, perhaps the better practice is to amend one's list of witnesses when additional witnesses become known. But, in the absence of an order expressly requiring the finalization of *proposed* witness lists, and prior to the final pretrial conference and order

that inherently finalizes such matters, we do not believe a party should be subject to severe sanctions for failure to amend a witness list. Here, there was simply no violation of any aspect of the case management orders, especially because Canaday's letter to defendant's counsel and the subsequent voluntary exchange of Sullivan's affidavit and the correspondence threatening a motion to compel the identification of the student witnesses served the identical purposes of the exchange requirements of the initial case management order. We note that some depositions of fact witnesses continued after the formal deadline for completion, and depositions of the additional witnesses could likewise have been completed without prejudicing the pretrial or trial dates. Moreover, Rule 140 contemplates that finalization of witnesses is an express activity for the *final* pretrial conference, and the Rule expressly addresses a procedure for disclosure of additional witnesses after the final pretrial conference. Rule 140(g)(5)(witness finalization) and (b) (supplementation) (2008 Kan. Ct. R. Annot. 220).

Even if there had been a violation of the case management order, the district court was limited in the procedure for imposing available sanctions by K.S.A. 2008 Supp. 60-216(f), which provides that upon violation of a "pretrial order" (broadly defined by subsection [e]), the court "may make such orders with regard thereto as are just," but the statute requires that the party to be sanctioned have an "opportunity to be heard." Here, the court entered its order striking witnesses in connection with a resolution of the summary judgment motion but absent any opportunity for Canaday's counsel to be heard in the matter.

Finally, we conclude that in exercising sound discretion in such matters, the district court is obligated to weigh the relative prejudice to each party, and here the prejudice to Canaday was potentially fatal to his case, but the prejudice to the defendant was one or more belated depositions. In determining whether the striking of witnesses was an abuse of discretion, we find instructive the factors adopted by the Third and Tenth United States Circuit Courts of Appeal, which include:

" '(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice,

(3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order.' " *Eastridge Development Co. v. Halpert Associates, Inc.*, 853 F.2d 772, 778 (10th Cir. 1988) (quoting *Myers v. Pennypack Woods Home Ownership Assn.*, 559 F.2d 894, 904-05 [3rd Cir. 1977]).

Applying these factors, we note that the defendant did not stand to be materially prejudiced or surprised by the testimony of the disputed witnesses, for the reasons already discussed; any such prejudice could have been cured by a belated deposition, even if on short notice and at Canaday's cost; any disruption in the trial scheduled for September could have been easily avoided by a less severe action, such as the belated depositions; and there was no bad faith or willfulness shown or suggested on the part of Canaday or his counsel. Accordingly, even if Canaday can be said to have violated some aspect of the case management order, it was an abuse of discretion to strike the disputed witnesses under these circumstances.

Before ending our discussion of this issue, we note that the problems encountered here could have been avoided by the inclusion in the case management order of a date certain for *final* identification of witnesses or by deferring resolution of the summary judgment motion until *after* the final pretrial conference, at which all parties would have been required to finalize all aspects of their respective cases, including witnesses. We understand and sympathize with the district court in requiring discovery orders to be honored, but the sanction chosen under these circumstances was simply too severe.

We conclude and hold that the district court's order striking witnesses was an abuse of discretion and must be reversed.

## Did the District Court Err in Awarding Summary Judgment to the Defendant?

Canaday next argues the district court erred in granting summary judgment to defendant, because there was a genuine issue of material fact as to whether the school district violated its duty of care to prevent foreseeable harm to Canaday. The argument fo-

cuses on the evidence that the district had adequate notice of Baird's propensities, thus creating a fact question as to the foreseeability of harm to students, specifically Canaday. The defendant argues that the evidence does not create such a fact question because the district superintendent received limited reports of Baird's misconduct and all such reports were investigated and found to be without merit.

The standards for review of a summary judgment are well known.

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The district court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." *In re Estate of Draper v. Bank of America*, 288 Kan. 510, Syl. ¶ 1, 205 P.3d 698 (2009).

The district court held that notice of Baird's misconduct was inadequate to establish foreseeability, reasoning in material part:

"Here there was no evidence that Midway employees were aware that Baird had sexually assaulted students prior to Plaintiff's claims in this matter. There is no evidence that Midway had any knowledge that Baird was sexually assaulting Plaintiff. While there was testimony of rumors involving Baird, after investigation, all parties denied anything improper had occurred when confronted by [District Superintendent] Albers. Albers interviewed both the students and Baird who were involved in the rumors of inappropriate contact. The students interviewed all denied anything improper occurred. Baird denied anything improper. Further, while Albers does not recall any rumors involving Plaintiff, according to Plaintiff's testimony when he was allegedly asked by Albers about any inappropriate contact with Baird, he stated he 'did not know what he [Albers] was talking about.' Plaintiff repeatedly testified that he did not report the inappropriate contact to anyone at Midway, to friends or relatives.

. . . .

"The uncontroverted facts are that when presented with information raising questions concerning Baird's interaction with students, Midway did respond but

did not uncover any information to lead to the conclusion that anything inappropriate occurred.

"Reports of Baird being alone with students is not enough to put Midway on notice that Baird was committing criminal acts by engaging in inappropriate sexual relationships with these individuals."

Midway did not contest its duty to school students in its care, admitting that school districts have a special relationship with students and that school districts "stand in the same position as do parents and guardians." *Beshears v. U.S.D. No. 305*, 261 Kan. 555, 560, 930 P.2d 1376 (1997); see also *Paulsen v. Unified School District No. 368*, 239 Kan. 180, 717 P.2d 1051 (1986) (court assumed that a duty to properly supervise and provide a safe environment to students existed, but affirmed the trial court's dismissal on the grounds that no breach of the duty had been shown); *Sly v. Board of Education*, 213 Kan. 415, 516 P.2d 895 (1973) (the court assumed that the duty to exercise due care for students existed and affirmed the trial court's finding that no evidence of breach of the duty existed); *Dunn v. U.S.D. No. 367*, 30 Kan. App. 2d. 215, 231, 40 P.3d 315, *rev. denied* 274 Kan. 1111 (2002). Here, the district court appeared to assume that a duty existed and focused on the foreseeability required for liability.

In order to establish a claim for negligence, the plaintiff must show breach of a duty owed by the defendant, damage to the plaintiff, and that the breach was the actual and proximate cause of the damage. Foreseeability is an element of proximate cause. *Aguirre v. Adams*, 15 Kan. App. 2d 470, 471-72, 809 P.2d 8 (1991). Notice is bound to the concept of foreseeability in that some knowledge or a reason to anticipate a danger is required for liability to attach. *Cupples v. State*, 18 Kan. App. 2d 864, 879, 861 P.2d 1360 (1993).

"Foreseeability, for the purpose of proving negligence, is defined as a common-sense perception of the risks involved in certain situations and includes whatever is likely enough to happen that a reasonably prudent person would take it into account. [Citation omitted.] An injury is foreseeable so as to give rise to a duty of care where a defendant knows or reasonably should know that an action or the failure to act will likely result in harm." *Cupples*, 18 Kan. App. 2d at 879.

Whether the risk of harm is reasonably foreseeable is a question to be determined by the trier of fact. *Long v. Turk*, 265 Kan. 855,

Syl. ¶ 4, 962 P.2d 1093 (1998); *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 362, 819 P.2d 587 (1991); *Estate of Pemberton v. John's Sports Center*, 35 Kan. App. 2d 809, Syl. ¶ 6, 135 P.3d 174, *rev. denied* 282 Kan. 788 (2006).

Our review of the uncontroverted facts reveals substantial evidence of notice to District Superintendent Albers that Baird acted inappropriately with students. Much, though not all, of this evidence cites the Sullivan affidavit, which the district court declined to consider. Moreover, in response to facts based on Sullivan's testimony, the defendant generally responded "Sullivan's affidavit is not properly before this Court." Because we have held that striking Sullivan as a witness was an abuse of discretion, we now include within our consideration the facts supported solely or in part by the testimony of Sullivan. Among the key facts bearing on the notice issue that were not effectively controverted by defendants are the following:

"6. Superintendent Bob Albers testified that he served as elementary school principal and Superintendent of the district. The Midway-Denton school is consolidated such that all grades are located on the same campus. It had only 200 total students so Albers knew them all.

"7. Albers testified that he first received a report in 1984 that Bob Baird, a teacher, coach and counselor at the Midway-Denton school, had inappropriately touched a student. That student was not Robert Canaday.

"8. Although he believed the report to be untrue, he testified that he did counsel Baird not to place himself in a position with students that could give rise to allegations or rumors.

"9. Albers received a second report of Baird engaging in inappropriate conduct with a student in 1986. He received the report from Jerry Sullivan about a student, not Robert Canaday. Sullivan told the Superintendent he caught Baird and a student alone on the stage on a Sunday afternoon in a situation in which 'Baird should not have put himself.'

"10. Albers claimed to have investigated these two events by speaking with the boys involved and to Baird, but to have found no facts to support the allegations.

"11. Albers also testified that Jerry Sullivan, a janitor reported to him that he suspected Baird of behaving inappropriately with a student.

"12. Superintendent Albers denied having received any reports of sexual impropriety by Baird on Plaintiff.

"13. Albers' testimony directly conflicts with that of Jerry Sullivan, a janitor. Mr. Sullivan testified that he reported his belief that Bob Baird was sexually abusing boys to Superintendent Albers between 1984 and 1988.

"14. Sullivan worked as a custodian for the USD 433 schools from approximately 1982 to 1988. He was assigned to an evening shift cleaning the Denton school facilities, working till midnight each shift.

"15. From about 1984 through 1988, Sullivan saw that Robert Baird was bringing male students from troubled or broken homes into the school from approximately 9 p.m. to midnight during school nights. Robert Baird brought several different male students with him, but most of the time it was only one at a time. Sullivan saw them playing basketball in the gymnasium.

"16. Sullivan would check for them later in the same night and would not be able to locate them in the gymnasium, in Baird's office, the shower room or in any part of the building that he searched although he did not look above the stage area.

"17. Sullivan began to suspect that Mr. Baird was engaging in sexual misconduct with the boys because Mr. Baird would regularly through the year bring a boy in the late hours to the school after 9:00 PM, even on school nights, but not to the gym for coaching, and not to his office for counseling.

"18. Sullivan also became suspicious of Mr. Baird's behavior because when he went to check on them later in the night, and was unable to locate them in the gymnasium or in Baird's office, or in any of the classrooms. On one occasion he found them in a room above and behind the stage in the gymnasium. On these occasions Sullivan confronted Baird about what he was doing with the student in the room above and behind the stage. Baird always had an excuse, such as they were looking for paint or props. The excuse never struck Sullivan as legitimate because he would find them in the room near midnight.

"19. Sullivan also became suspicious of Mr. Baird's behavior because he would hear many of the USD 433 employees, such as his supervisor, Richard Miller, and others in the community openly discuss rumors that Mr. Baird was sexually abusing children. Robert Baird would engage in this suspicious behavior with several different boys, one of whom Sullivan remembers to have been Robert Canaday.

"20. On one night in winter sometime between 1984 through 1988, Sullivan recalls being inside a classroom at the school during his evening shift, with Nancy Helmstetter, the other custodian and her husband who was at the school building waiting to pick her up. Nancy's sons and Mike Long, were at the school playing in the hallways and the gymnasium.

"21. Mike Long came into the classroom where they were standing and said he saw a boy and Coach Baird on the stage, and that it was embarrassing.

"22. Shortly after Mr. Baird entered the classroom with Plaintiff and looked shaken and asked the group what they needed.

"23. Shortly thereafter, Nancy Helmstetter, her husband and Sullivan went to the stage area to investigate.

"24. The three saw a fluid Sullivan knew from experience to be semen on the floor. He went so far as to pick it up with a matchbook cover and show it to Nancy Helmstetter and her husband.

"25. The group decided to report what they had witnessed. In this same approximate time period of 1984 through 1988, Sullivan had gone to Mr. Bob Albers['] office and stated his concerns and suspicions about Robert Baird's practice of bringing the unaccompanied male students to the gymnasium late at night. Mr. Albers told Sullivan that unless one of the male students would admit that something inappropriate had occurred, there was nothing that he could do about Mr. Baird's conduct. Sullivan also reported to Bob Albers that they had seen semen on the floor after the strange behavior of Mr. Baird that night.

"26. After Sullivan reported these concerns, the school district employees made him feel uncomfortable, like he was a trouble-maker, and were trying to drive him from his employment at the school district. Because of the way the school district treated him after he reported Mr. Baird's inappropriate conduct, Sullivan quit working at the school district.

"27. Superintendent Albers also denied having received any report from Richard Miller, the maintenance supervisor, concerning Bob Baird.

"28. However, Richard Miller testified he did report Baird's activities with boys.

"29. Richard Miller worked for the School District from 1974 until 1994 as 'Director of maintenance.' Mr. Miller's job as director included supervision of other School District employees.

"30. In 1983 or 1984, Mr. Miller observed an unusual, in his view, situation where a student before Canaday was in a one-on-one situation with Baird. The student alone with Baird was male. The student alone with Baird was 15 or 16-years-old, a little older than Canaday was at the time.

"31. The day Miller observed this unusual situation, the teachers were all off-campus for training, the students were at home, so the building was supposed to be empty except for the custodians and Miller.

"32. At about 10 a.m., Miller observed Baird shooting baskets with a student. About fifteen minutes later, Miller returned to lock up the gym, when he heard scuffling sounds in the boys' locker room.

"33. Miller testified at his deposition: 'And then I thought about that for a long while and the first thing that came to my mind it was that wasn't proper, something was wrong.' Miller believed something was wrong because the student was from a single-parent home, he thought it was unusual for the boy to be alone with another man who was not his parent—'It just didn't—it wasn't right.'

"34. Miller reported to Superintendent Albers his concerns about what he saw and heard. Superintendent Albers told Miller that he would speak to Baird about Miller's report.

"35. Miller followed up with his report a week later by asking Superintendent Albers if 'my report was justified.'

"36. Superintendent Albers replied that yes, Mr. Miller's report was justified."

Thus, the remaining question before this court is whether these facts adequately created a genuine issue of material fact as to notice and foreseeability so as to preclude summary judgment. We hold

that such facts were more than adequate for these purposes and that it was error to award summary judgment to defendants.

The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom summary judgment is sought. *Miller v. Westport Ins. Corp.*, 288 Kan. at 32. We conclude that a host of facts and inferences, viewed in the light most favorable to Canaday, indicate that summary judgment was not proper in this case. It can be reasonably inferred that Albers had substantial knowledge that Baird had a proclivity to inappropriate relationships with students and he had direct knowledge of a potentially inappropriate relationship between Canaday and Baird. Although the jury may decide that Albers' investigation discharged any further duty, foreseeability was a genuine issue of material fact and plaintiff was entitled to jury consideration of that issue. Accordingly, granting summary judgment on the basis that Midway did not have notice was error.

Likewise, and for the same reasons, the intentional tort claims should not have been dismissed on summary judgment.

Given our conclusion and holding on both issues presented, we are compelled to reverse the district court's award of summary judgment to Midway and remand for further proceedings.

Reversed and remanded.