NOT DESIGNATED FOR PUBLICATION

No. 121,276

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KAREN E. DAVIS,
*Appellant*,

v.

FADI ESTEPHAN, M.D.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Barton District Court; MIKE KEELEY, judge. Opinion filed December 11, 2020. Affirmed.

*Matthew R. Bergmann* and *Kevin M. Fowler*, of Frieden & Forbes, LLP, of Topeka, for appellant.

*Brian L. White* and *Mark R. Maloney*, of Hinkle Law Firm, LLC, of Wichita, for appellee.

Before GREEN, P.J., STANDRIDGE, J., and MCANANY, S.J.

PER CURIAM: Our Supreme Court has recognized the importance of expert testimony in medical malpractice cases. This court's declaration is relevant to this issue: "'Expert testimony is generally required in medical malpractice cases to establish the applicable standard of care and to prove causation, except where lack of reasonable care or existence of proximate cause is apparent to an average layperson from common knowledge or experience.'" *Biglow v. Eidenberg*, 308 Kan. 873, 887-88, 424 P.3d 515 (2018) (quoting *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 435-36, 228 P.3d 1048 [2010]).

1

Also, under K.S.A. 2019 Supp. 60-226(b)(6)(A), "[a] party must disclose to other parties the identity of any witness it may use at trial to present expert testimony." Additionally, under K.S.A. 2019 Supp. 60-226(b)(6)(C), a party must make all expert disclosures "at the times and in the sequence that the court orders." "If a party fails to provide information or identify a witness as required by K.S.A. 60-226(b)(6) . . . the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." K.S.A. 2019 Supp. 60-237(c)(1).

In this case, Karen E. Davis sued Fadi Estephan, M.D. for medical malpractice. She alleged that Dr. Estephan misdiagnosed her with symptomatic multiple myeloma. Dr. Estephan later moved for summary judgment against Davis. He argued that Davis could not prove her medical malpractice case against him because she had not timely disclosed an expert medical witness who would testify that he had deviated from the applicable medical standard of care in this case. Davis countered Dr. Estephan's summary judgment motion in two ways. First, Davis moved to disclose a new expert witness. Specifically, she filed a disclosure listing her expert medical witness. Second, and alternatively, Davis asserted that regardless of any problems pertaining to her previous expert witness disclosure, she could still present her case to the jury based on certain admissions made by Dr. Estephan.

The trial court, however, rejected both Davis' motion and her alternative arguments. The court ruled that Davis' disclosure of her expert medical witness was untimely. And the court also ruled that Davis had never timely disclosed an expert medical witness. Thus, the court granted summary judgment in Dr. Estephan's favor.

On appeal, Davis argues that the trial court erred by rejecting her disclosure of her expert medical witness as untimely. She contends that her disclosure was timely and that even if it was untimely, the trial court should have allowed the belated disclosure of her

2

medical expert because it would not have prejudiced Dr. Estephan. She further argues that summary judgment in Dr. Estephan's favor was inappropriate because other evidence indicated that Dr. Estephan was negligent and because the parties had not completed discovery.

Nevertheless, for reasons set forth below, we reject Davis' arguments and affirm.

*Background*

In December 2011, Davis' primary care physician referred her to Dr. Estephan, an oncologist, for an evaluation based on Davis' elevated protein levels. Davis met with Dr. Estephan on December 13, 2011, at which time Dr. Estephan recommended that Davis undergo further medical testing. A few days after Davis completed this testing, Dr. Estephan relied on Davis' test results to diagnose Davis with multiple myeloma.

Multiple myeloma is a malignant cancer "that originates in bone marrow and involves chiefly the skeleton, with clinical features attributable to the sites of involvement and to abnormalities in formation of plasma protein." *Stedman's Medical Dictionary*, 582910. There are two types of multiple myeloma—symptomatic multiple myeloma and asymptomatic multiple myeloma. Persons with symptomatic multiple myeloma must have at least one of the following abnormalities:  (1) increased *calcium* levels, (2) *renal* failure, (3) *anemia*, or (4) *bone* lesions. Doctors commonly refer to the preceding abnormalities as the CRAB criteria. Persons with asymptomatic myeloma must also exhibit a CRAB criteria. Yet, unlike persons with symptomatic multiple myeloma, persons with asymptomatic multiple myeloma do not exhibit symptoms of end-organ damage. Thus, the difference between symptomatic multiple myeloma and asymptomatic multiple myeloma is the presence of end-organ damage.

Each year, about 10 percent of people suffering from asymptomatic multiple myeloma develop end-organ damage. As a result, each year, about 10 percent of persons suffering from multiple myeloma have their disease progress from asymptomatic to symptomatic multiple myeloma. Although chemotherapy is a standard treatment for symptomatic multiple myeloma, it is not necessarily a standard treatment for asymptomatic multiple myeloma. Instead, when a person suffers from asymptomatic multiple myeloma, a doctor may choose to monitor the person's health, avoiding chemotherapy treatment unless the person's multiple myeloma becomes symptomatic.

As for Davis, Dr. Estephan diagnosed Davis with symptomatic multiple myeloma based on the following: (1) Davis had a history of abnormally high calcium levels; (2) Davis presently had abnormally high levels of plasma in her bones; (3) Davis presently had monoclonal protein—the abnormal protein associated with multiple myeloma—in her blood and urine; (4) Davis presently had both abnormally high and low levels of different immunoglobin proteins—the proteins associated with antibodies; and (5) Davis presently suffered from end-organ damage in the form of osteoporosis. After diagnosing Davis with symptomatic multiple myeloma, Dr. Estephan directed Davis to begin chemotherapy immediately.

Davis received chemotherapy treatments from January 2012 to June 2012. In June 2012, however, Davis expressed concerns about her ongoing chemotherapy treatment. She questioned Dr. Estephan about whether she needed to continue chemotherapy. Although Dr. Estephan told Davis that chemotherapy treatments were necessary to control her multiple myeloma symptoms, Davis decided to discontinue chemotherapy because the side effects of her chemotherapy treatments were too severe.

After discontinuing chemotherapy in June 2012, Davis had another appointment with her primary care physician. At the end of that appointment, the primary care physician referred Davis to the Mayo Clinic oncology department for a secondary

4

evaluation. During her September 11, 2012 evaluation with Dr. Nelson Leung, a Mayo Clinic oncologist, Dr. Leung performed additional medical testing on Davis. Based on those test results, as well as her medical records, Dr. Leung concluded that Davis suffered from either monoclonal gammopathy (MGUS) or asymptomatic multiple myeloma, with MGUS being the more probable diagnosis.

A person suffering from MGUS has the abnormal monoclonal protein associated with multiple myeloma in their blood. Yet, it is clinically unclear why the abnormal monoclonal protein is in the person's blood. That is, "there is no evidence of multiple myeloma or other malignant disorders" despite the presence of the abnormal protein. *Stedman's Medical Dictionary*, 360740. Each year, about one percent of people suffering from MGUS develop symptomatic multiple myeloma.

In making his MGUS diagnosis, Dr. Leung recognized that Davis had historically suffered from abnormally high calcium levels. Even so, Dr. Leung believed that Davis' abnormally high calcium levels were the result of Davis' unrelated hyperthyroid disorder. Based on this belief, Dr. Leung concluded that Davis was not exhibiting any of the CRAB criteria, and, thus, could not have symptomatic multiple myeloma. Dr. Leung then advised Davis to not restart chemotherapy.

Despite Dr. Leung's probable MGUS diagnosis, Davis continued to suffer from various ailments. For instance, about 10 months after she stopped chemotherapy, Davis broke her back. Because of her continued medical problems, Davis sought the advice of a third oncologist in October 2013. This third oncologist discovered that Davis now had bone lesions. Like Dr. Estephan, this third oncologist diagnosed Davis with symptomatic multiple myeloma. Davis then sought the advice of a fourth oncologist. In December 2013, this fourth oncologist also diagnosed Davis with symptomatic multiple myeloma.

It is undisputed that Davis continues to suffer from symptomatic multiple myeloma to this day.

*Davis Sues Dr. Estephan*

In September 2014, about two years after her evaluation with Dr. Leung, Davis sued Dr. Estephan for medical malpractice. In her petition, Davis asserted that Dr. Estephan failed to follow the applicable medical standard of care when diagnosing her with symptomatic multiple myeloma. According to Davis, Dr. Estephan's negligence resulted in him misdiagnosing her with symptomatic multiple myeloma and recommending needless chemotherapy treatments. Davis then argued that Dr. Estephan's negligence entitled her to both economic and noneconomic damages exceeding $75,000.

Dr. Estephan responded by denying Davis' allegation of medical malpractice. He argued that he had complied with the applicable medical standard of care when diagnosing Davis with symptomatic multiple myeloma, rendering Davis' lawsuit meritless.

*Expert Witness Disclosure*

After Davis filed suit, the parties started the discovery process. On April 17, 2015, Davis faxed Dr. Estephan a report from Dr. Michael Hurwitz. Dr. Hurwitz' report stated that he did not believe that Davis "fulfilled the criteria for treatment for multiple myeloma" when Dr. Estephan diagnosed her with symptomatic multiple myeloma. Significantly, although Davis exchanged Dr. Hurwitz' report as part of discovery, she did not disclose Dr. Hurwitz as an expert witness in accordance with K.S.A. 2014 Supp. 60-226(b)(6) when she provided Dr. Estephan with Dr. Hurwitz' report.

6

From this point, nothing relevant concerning Davis' potential expert witnesses occurred until October 13, 2016. On that date, the trial court issued a status conference order requiring Davis to "serve upon [Dr. Estephan] her expert reports by December 15, 2016." The trial court's order also stated that "[f]ollowing review of the expert reports, mediation [was] to be conducted."

Davis, however, did not provide Dr. Estephan with any additional expert reports by December 15, 2016. Likewise, Davis did not disclose any expert witnesses in accordance with K.S.A. 2016 Supp. 60-226(b)(6) by December 15, 2016. Instead, on January 4, 2017, Matthew Bergmann, Davis' lead counsel, moved to extend Davis' deadline to provide Dr. Estephan with her expert reports. In this motion, Bergmann explained that the extension was necessary because of his wife's ongoing medical issues.

Dr. Estephan opposed Davis' requested extension. In his response, Dr. Estephan emphasized that Davis' lawsuit against him had already been pending for over two years, that Davis had already provided him with Dr. Hurwitz' expert report, and that Davis' motion requesting an extension of the expert report deadline was untimely.

On January 23, 2017, the trial court held a hearing on Davis' time-extension motion. In addition to the arguments in Davis' written motion, Bergmann told the trial court that the extension was necessary because Dr. Hurwitz was no longer willing to testify on Davis' behalf given his recent retirement.

Bergmann then told the trial court that Davis was not going to obtain a new expert witness. According to Bergmann, he had the following strategy for Davis' case:

> "[W]e've contacted the treating physician in Mayo[], and they are—they're always a little hesitant to provide expert opinions on one way or another as far as a formal report. Our methodology right now is to use—use the treating medical records

7

from the Mayo physician as a basis for our expert. And then at some point we would have to depose that doctor prior to trial.

".... I don't see us going out and wasting more time and trying to engage another expert. I think we're going to try to work through the Mayo records and get that evidence in to support our position."

After Bergmann made the preceding statements, the trial court questioned Bergmann about his planned strategy. At that time, the following exchange occurred:

"THE COURT: .... I guess I need to be a little clearer on this. If you're not going to use [Dr.] H[u]rwitz, and you're kind of going to use the summary or the notes and so on . . . don't you have to have an expert to testify . . . in a medical malpractice case?

"MR. BERGMANN: Correct, Your Honor. And for the purposes of the disclosures, I believe the treating records can suffice for the written records and then have the physician—the treating physician from Mayo testify through a deposition . . . for expert purposes. That would be our intent. I will tell you on the record that we are not relying on [Dr.] H[u]rwitz any further because of his change in circumstances. So . . .

"THE COURT: So your report—I mean, if I were to extend it for a period of time, I mean, that's an extension to list and set out a[n] expert witness, I believe, is what the—what we would be talking about. And then, you know again, I know it might take a few weeks or something to get that deposition set up. But are you telling me you would have someone listed as—you would list someone as the treating—a treating physician as your expert?

"MR. BERGMANN: That's my understanding, Your Honor. We would identify the treater at Mayo[] and have to depose them—or him, based on his treatment records. Now I, haven't called and asked for a schedule for depositions obviously. . . ."

After this exchange, the trial court granted Davis' time-extension motion based on Bergmann's excusable neglect. The trial court then extended Davis' "expert deadline" to February 15, 2017. The trial court concluded the hearing by noting that the parties should engage in mediation after they disclosed their respective expert witnesses. It also ordered

8

Bergmann to create a written order for it to sign summarizing its oral rulings. When Bergmann ultimately provided the written order to the trial court to sign on February 8, 2017, that written order stated the following: (1) that "Plaintiff [would] serve upon Defendant her expert report on or before February 1[5], 2017," and (2) that "[f]ollowing [a] review of the expert reports, mediation [was] to be conducted."

On February 14, 2017, Davis filed her "designation of expert witnesses." In this filing, Davis disclosed Dr. Leung as her expert witness. She asserted that Dr. Leung would provide testimony "in line with the information and opinion contained in [the Mayo] medical records." Even so, when Davis designated Dr. Leung as her expert witness, she did not attach a report from Dr. Leung detailing Dr. Leung's proposed testimony about Dr. Estephan's compliance with the applicable medical standard of care.

*Dr. Estephan's Summary Judgment Motion*

On September 5, 2017, about seven months after Davis filed her disclosure listing Dr. Leung as her expert witness, Dr. Estephan moved for summary judgment. In his summary judgment motion, Dr. Estephan first pointed to Kansas caselaw establishing that absent blatant negligence, plaintiffs must support their allegations of medical malpractice with expert witness testimony. Dr. Estephan then noted that Davis never produced Dr. Leung's expert witness report—clearly alleging that Dr. Leung would testify—that Dr. Estephan had deviated from the applicable medical standard of care based on Davis' filed February 14, 2017 expert witness disclosure. Dr. Estephan therefore argued that Davis could not establish that he negligently diagnosed her with symptomatic multiple myeloma without such expert witness testimony. For this reason, Dr. Estephan also argued that summary judgment in his favor was appropriate.

Next, on September 12, 2017, the trial court held a status conference. At the status conference, the trial court first ordered the parties to attempt mediation. Then, under the

9

assumption that mediation failed, the trial court ordered Davis to respond to Dr. Estephan's summary judgment motion within 20 days of the failed mediation date.

Mediation failed on October 31, 2017. Twenty days later, on November 20, 2017, Davis moved to extend her deadline to respond to Dr. Estephan's summary judgment motion by two days. The trial court granted Davis' motion for the two-day extension. Nevertheless, on November 22, 2017, Davis did not file a response to Dr. Estephan's summary judgment motion. Instead, she filed two motions. In the first motion, she requested that the trial court give her leave to disclose a new expert witness. In the second motion, she requested that the trial court extend her time to respond to Dr. Estephan's summary judgment motion.

Bergmann, arguing on Davis' behalf, explained that the trial court should grant Davis' motion to disclose a new expert witness because his understanding of the trial court's previous orders regarding the expert witness disclosure deadline was as follows:

> "The Court issued an order on February 8, 201[7], similar to that of the order issued by the Court in October 2016[,] stating that following Defendant's review of Plaintiff expert reports, the case was to be mediated by the parties. . . . At all times related to the discussions had and in relation to the orders issue[d] by the Court in both October 2016 and February 2017, Plaintiff understood the production of any expert report was for the purposes of mediation and not a final designation of expert witnesses or expert reports."

In addition to arguing that the trial court's February 15, 2017 expert witness disclosure deadline constituted a deadline for mediation purposes only, Bergmann argued that Davis should be allowed to disclose a new expert witness because Dr. Hurwitz had unexpectedly retired and could no longer testify as an expert witness. Bergmann further argued that the disclosure of a new expert witness would not prejudice Dr. Estephan. In making this last argument, Davis asserted that disclosure of a new expert witness would

not prejudice Dr. Estephan because she had already provided Dr. Estephan with Dr. Hurwitz' report during discovery.

Dr. Estephan responded to Davis' motion by opposing it for several reasons. First, Dr. Estephan argued that nothing supported Davis' assertion that the trial court's prior expert witness disclosure deadline pertained solely to mediation. In making this argument, Dr. Estephan asserted that the trial court's orders regarding mediation were distinct from its orders regarding expert witnesses. Next, Dr. Estephan argued that Dr. Hurwitz' retirement was not an unforeseen event that entitled Davis to disclose a new expert witness because Bergmann knew of Dr. Hurwitz' retirement as of the January 23, 2017 hearing on Davis' motion to extend her expert witness disclosure deadline.

Also, Dr. Estephan argued that allowing Davis to disclose a new expert witness would harm him because Davis' case against him had been pending for over three years and because he had moved for summary judgment against Davis based on her failure to timely disclose an expert witness who would testify that he deviated from the applicable medical standard of care. Dr. Estephan then argued that whether Davis had given him Dr. Hurwitz' report during discovery was irrelevant because Davis never timely disclosed Dr. Hurwitz as an expert witness in accordance with K.S.A. 2017 Supp. 60-226(b)(6)(C).

Afterward, Davis moved for, and was granted, an extension to reply to Dr. Estephan's response to her motions to disclose a new expert witness and to extend her time to respond to Dr. Estephan's summary judgment motion. The trial court's order required Davis to file her reply no later than December 30, 2017.

Davis, however, did not file her reply by this date. Instead, on January 2, 2018, Davis moved for another extension to file her reply. In this motion, Bergmann told the trial court that a two-day extension was necessary because Davis had been hospitalized, which prevented him from personally discussing the details of a potential reply. Also,

11

Bergmann noted that he was requesting the extension even though he acknowledged that the trial court had already scheduled a hearing for January 24, 2018, to address Davis' pending motion to disclose a new expert witness and motion to extend her deadline to respond to Dr. Estephan's summary judgment motion.

But nothing in the record on appeal indicates that the trial court ever ruled on the preceding two-day extension motion. On that basis, it seems that Davis never filed a reply to Dr. Estephan's response to her motions to disclose a new expert witness and to extend her deadline to respond to Dr. Estephan's summary judgment motion.

Instead, on January 23, 2018, one day before the scheduled hearing on her pending motions, Davis filed a disclosure listing Dr. Hurwitz as her expert witness. Significantly, Davis included no arguments in her disclosure. Even so, based on Davis' previous motion to disclose a new expert witness, it was apparent that Davis was now moving to disclose Dr. Hurwitz as her expert witness. Of additional note, the only item attached to Davis' January 23, 2018 disclosure was a sworn affidavit from Dr. Hurwitz. In this sworn affidavit, which was also executed on January 23, 2018, Dr. Hurwitz stated that "[a]fter meeting with Plaintiff's counsel, and learning that my participation may be necessary for Ms. Davis to present her case, I have reconsidered my position and will serve as plaintiff's medical expert."

The next day, at the previously scheduled hearing on Davis' pending motions to disclose a new expert witness and extend her deadline to respond to Dr. Estephan's summary judgment motion, Davis orally requested that the trial court allow her to disclose Dr. Hurwitz as her expert witness. Dr. Estephan's counsel responded that he had been blindsided by Davis' most recent filing disclosing Dr. Hurwitz as her expert witness since Bergmann had previously explained to the trial court that Davis would not be using Dr. Hurwitz as her expert witness.

12

Although the trial court initially took the parties' arguments under advisement, it eventually denied Davis' motion to disclose a new expert witness, which included Davis' recent attempt to disclose Dr. Hurwitz as her expert witness. The trial court explained its reasons for denying Davis' motion as follows:

"The Court finds [that] the facts support [that] Dr. Hurwitz was not going to be an expert. The plaintiff was going to rely on other witnesses and those witnesses were designated in February of 2017. The designation deadline of February 15, 2017, was an extension from December 15, 2016, [deadline,] which had been objected to by the defendant. The Court felt [that] the first extension was appropriate; however, the Court finds [that] the plaintiff has had ample time and numerous opportunities to obtain an expert, and in fact, listed experts under the deadline of February 2017. The Court does not accept the argument [that] the plaintiff believes [that] this expert designation was only for the purpose of mediation. The Court has never had two separate designations, one to allow a party to designate an expert prior to mediation, and if unsuccessful at mediation, to designate new experts. The Court does not find [that] this is the intent of [K.S.A. 2017 Supp. 60-226(b)(6)] or the intent of the courts in other cases or in this case."

The trial court further explained that it was denying Davis' motions because allowing her to disclose a new expert witness would harm Dr. Estephan by continuing to delay the case, which had already been pending for over three years, and by nullifying the basis of Dr. Estephan's summary judgment motion. The trial court concluded by giving Davis until March 9, 2018, to respond to Dr. Estephan's motion for summary judgment.

Yet, on March 7, 2018, Davis moved for another extension to respond to Dr. Estephan's summary judgment motion. In this motion, Davis argued that the trial court should not make her respond to Dr. Estephan's motion until the parties had taken the depositions of Dr. Estephan's expert witness *and Dr. Leung*. Bergmann, arguing on Davis' behalf, now alleged that Dr. Leung's testimony was "vital" because "[he] aniticipate[d] eliciting testimony to directly oppose issues raised in [Dr. Estephan's] pending motion for summary judgment. Principally, Dr. Leung's opinion that the standard

13

of care was breached by [Dr. Estephan] in his care and treatment of [Davis]." Bergmann also alleged that he had been "work[ing] diligently" to schedule Dr. Leung's deposition.

The next day, March 8, 2018, Dr. Estephan responded that the trial court should deny Davis' request because despite listing Dr. Leung as her expert witness in her February 14, 2017 disclosure, it was undisputed that Davis had not retained Dr. Leung as her expert witness. Dr. Estephan also argued that the trial court should deny Davis' motion because Davis' disclosure designating Dr. Leung as an expert witness did not state whether Dr. Leung would testify about his alleged noncompliance with the applicable medical standard of care when diagnosing Davis with symptomatic multiple myeloma. Dr. Estephan further noted that Davis had not procured a report from Dr. Leung discussing his alleged noncompliance with the applicable medical standard of care. Indeed, in this motion, Dr. Estephan's counsel explained that he had only recently been contacted by Bergmann to schedule a deposition for Dr. Leung. Based on this fact, Dr. Estephan's counsel speculated that Bergmann wanted to depose Dr. Leung with "the hope" that he would testify about Dr. Estephan's alleged noncompliance with the applicable medical standard of care.

Nevertheless, on March 27, 2018, the trial court issued an order granting Davis' motion to the extent it involved deposing Dr. Leung. The trial court explained that it was granting Davis' motion because

"under [the] circumstances, wherein the Court did not allow [Davis] to add or supplement her expert witness list in February of 2018, the Court [would] allow additional discovery for [Davis'] listed expert to determine if he [would] state what [was] needed or necessary to rebut [Dr. Estephan's] motion for summary judgment."

Afterward, on April 12, 2018, Davis deposed Dr. Leung. At his deposition, Dr. Leung explained why he believed that Davis was likely suffering from MGUS (which

14

would indicate why he believed Davis was not suffering from symptomatic multiple myeloma) when he evaluated her in September 2012. He also testified about the CRAB criteria and his belief that Davis was not suffering from any of the CRAB criteria when he evaluated her in September 2012.

Yet, during cross-examination by Dr. Estephan's counsel, Dr. Leung explicitly testified that it was not his intention "to testify about the course of the care and treatment provided [by Dr. Estephan]." Dr. Leung explained that he was only willing to testify about the treatment and care he provided to Davis in September 2012. During his cross-examination, Dr. Leung further revealed that Bergmann had first contacted him about testifying on Davis' behalf on March 13, 2018, and he had never seen Davis' February 14, 2017 expert witness disclosure listing him as her expert witness.

Following Dr. Leung's deposition, Davis responded to Dr. Estephan's summary judgment motion. Despite Dr. Leung's refusal to testify about Dr. Estephan's alleged noncompliance with the applicable medical standard of care when diagnosing her with symptomatic multiple myeloma, Davis argued that the trial court should deny Dr. Estephan's summary judgment motion. Specifically, Davis argued that Dr. Estephan's deposition testimony established that he agreed with the following: (1) that the CRAB criteria constituted the applicable medical standard of care when diagnosing a person with either symptomatic or asymptomatic multiple myeloma and (2) that Dr. Estephan diagnosed her with symptomatic multiple myeloma even though he knew that she was not currently suffering from any of the CRAB criteria when he made the diagnosis.

Because she alleged that Dr. Estephan agreed that the CRAB criteria constituted the applicable medical standard of care, and because she alleged that Dr. Estephan agreed that she was not actively suffering from any of the CRAB criteria at the time of diagnosis, Davis argued that she could present her case to a jury without an expert

15

witness. Davis then concluded her response by asking the trial court to reconsider its previous ruling denying her motion to disclose Dr. Hurwitz as her expert witness.

Next, Dr. Estephan filed a reply in which he argued that Davis' responsive arguments were meritless for several reasons. To begin with, Dr. Estephan argued that Davis' arguments ignored that she had no expert witness willing to testify about whether he had deviated from the applicable medical standard of care when diagnosing her with symptomatic multiple myeloma. Dr. Estephan alleged that no genuine issue of material fact could exist without such testimony, and, thus, Davis' medical malpractice case against him was legally deficient. Dr. Estephan further argued that even if the trial court considered Dr. Leung's opinion that Davis did not suffer from symptomatic multiple myeloma in September 2012, this had no bearing on whether Davis suffered from symptomatic multiple myeloma when he diagnosed her with it back in December 2011.

Dr. Estephan then took issue with Davis' contention that he agreed that the CRAB criteria constituted the applicable medical standard of care and that she was not suffering from any of the CRAB criteria when he diagnosed her with symptomatic multiple myeloma. Finally, Dr. Estephan argued that the trial court should deny Davis' latest request to disclose Dr. Hurwitz as an expert witness for the same reasons the trial court denied Davis' original request to disclose Dr. Hurwitz as an expert witness.

Eventually, the trial court held a hearing on Dr. Estephan's motion for summary judgment. At the hearing, the parties repeated their respective arguments regarding the appropriateness of Dr. Estephan's summary judgment motion. Although the trial court initially took the parties' arguments under advisement, the trial court ultimately granted Dr. Estephan's summary judgment motion.

In its order granting Dr. Estephan's summary judgment motion, the trial court explained that Kansas caselaw established that plaintiffs must prove their medical

16

malpractice claims through expert witness testimony unless the claim at issue involved blatant negligence. The trial court then found that under the facts of Davis' case, Davis needed expert witness testimony to establish that Dr. Estephan had deviated from the applicable medical standard of care when diagnosing her with symptomatic multiple myeloma. Because Davis had no such expert testimony to support her medical malpractice claim, the trial court ruled that Dr. Estephan was entitled to summary judgment because no genuine issue of material fact existed. Although the trial court did not explicitly rule on Davis' pending motion asking the trial court to reconsider its prior ruling denying her request to designate Dr. Hurwitz as her expert witness, the trial court effectively denied this motion by granting Dr. Estephan's summary judgment motion.

Davis timely appeals.

*Did the Trial Court Err by Rejecting Davis' Disclosure of Dr. Hurwitz as Her Expert Witness?*

Davis' primary argument on appeal is that the trial court abused its discretion by denying her November 22, 2017 motion to disclose a new expert witness and by rejecting her January 23, 2018 disclosure of Dr. Hurwitz as her expert witness. As she did below, Davis asserts that the trial court's February 8, 2017 order stating that she must file her "expert report" no later than February 15, 2017, was merely an order regarding her expert witness disclosure deadline before the parties attempted mediation. Based on this contention, Davis contends that her January 23, 2018 disclosure of Dr. Hurwitz as her expert witness was timely and that the trial court erred by finding otherwise.

*Applicable Law*

As noted in our introduction, K.S.A. 2019 Supp. 60-226(b)(6) outlines the procedure on disclosing expert witnesses. K.S.A. 2019 Supp. 60-226(b)(6)(A) states that

17

"[a] party must disclose to other parties the identity of any witness it may use at trial to present expert testimony." Moreover, this disclosure must include "[t]he subject matter on which the expert is expected to testify," as well as "the substance of the facts and opinions to which the expert is expected to testify." K.S.A. 2019 Supp. 60-226(b)(6)(A)(i)-(ii).

Subsection (b)(6)(C) of K.S.A. 2019 Supp. 60-226 clarifies when parties must make their expert witness disclosures. It provides that when the trial court has a specific deadline on expert witness disclosures, "[a] party must make these disclosures at the times and in the sequence that the court orders." If, however, there is no court order and the parties have not stipulated to an expert witness disclosure deadline, then a party must make their expert witness disclosures "[a]t least 90 days before the date set for trial or for the case to be ready for trial." K.S.A. 2019 Supp. 60-226(b)(6)(C)(i).

Also, under K.S.A. 2019 Supp. 60-226(e)(1)(A), a party "must supplement or correct" any expert witness disclosure made under subsection (b)(6) "[i]n a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect." As a result, K.S.A. 2019 Supp. 60-226(e)(1)(A) provides that a party must amend a prior expert witness disclosure if that party learns that the prior expert witness disclosure contains materially incorrect information.

Meanwhile, K.S.A. 2019 Supp. 60-237(c)(1) addresses what happens when a party fails to comply with the preceding expert witness disclosure rules. It states:

> "If a party fails to provide information or identify a witness as required by K.S.A. 60-226(b)(6) or (e), and amendments thereto, *the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing or at a trial, unless the failure was substantially justified or is harmless*." (Emphasis added.)

18

Previously, our Supreme Court has analyzed K.S.A. 2019 Supp. 60-226(b)(6)(C) in light of K.S.A. 2019 Supp. 60-237(c)(1)'s rule. Our Supreme Court has held that under K.S.A. 2019 Supp. 60-237(c)(1)'s plain language, "a party's failure to disclose witness information required by a court's scheduling order entered pursuant to K.S.A. 60-226(b)(6)(C) precludes that testimony unless the court finds the failure was substantially justified or harmless." *Miller v. Johnson*, 295 Kan. 636, 687, 289 P.3d 1098 (2012), *abrogated on other grounds by Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 442 P.3d 509 (2019). Thus, parties who violate K.S.A. 2019 Supp. 60-226(b)(6)(C)'s rule on expert witness disclosure deadlines cannot rely on an improperly disclosed expert witness' testimony at trial unless they provide an acceptable explanation for violating K.S.A. 2019 Supp. 60-226(b)(6)(C) or their violation of K.S.A. 2019 Supp. 60-226(b)(6)(C) did not harm the opposing party.

Issues of statutory interpretation involve questions of law over which this court exercises unlimited review. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019). Also, issues pertaining to interpretation of a court order involve questions of law over which this court exercises unlimited review. *Einsel v. Einsel*, 304 Kan. 567, 581, 374 P.3d 612 (2016).

Yet, when reviewing a trial court's decision to bar an improperly disclosed expert witness from testifying at trial as stated under K.S.A. 2019 Supp. 60-237(c)(1), an appellate court considers whether the trial court abused its discretion. *Miller*, 295 Kan. at 687. A judicial action constitutes an abuse of discretion if it is based on an error of law, based on an error of fact, or based on an otherwise unreasonable decision. *Biglow*, 308 Kan. at 893. Also, the party alleging that the trial court abused its discretion carries the burden of proof. *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017).

*Untimely Expert Witness Disclosure*

With these standards in mind, we now turn to Davis' primary argument regarding the trial court's rejection of her January 23, 2018 disclosure of Dr. Hurwitz as her expert witness. Davis' primary argument hinges on her contention that the trial court's February 8, 2017 order requiring her to disclose her expert witnesses by February 15, 2017, created an expert witness disclosure deadline for mediation purposes only. Nevertheless, the record affords no sound basis for Davis to make this contention.

To begin with, at the January 23, 2017 hearing where Davis argued for an extension of her expert witness disclosure deadline, the trial court never stated that the expert witness disclosure deadline was for mediation purposes only. Although the trial court noted that the parties were to mediate after disclosing their expert witnesses, the trial court never linked the expert witness disclosure deadline to the parties' future mediation plans. Also at the hearing, Bergmann, who explained Davis' expert witness strategy at length, never indicated that he believed that the expert witness disclosure deadline was a deadline for mediation purposes only.

In addition, Bergmann drafted the trial court's February 8, 2017 order stating that Davis' expert witness disclosure deadline was February 15, 2017. Yet, the February 8, 2017 order did not link Davis' February 15, 2017 expert witness disclosure deadline to the parties' future mediation plans. Instead, in the February 8, 2017 order, the trial court first ordered Davis to disclose any expert witness by February 15, 2017. Then it ordered that "[f]ollowing [a] review of the expert reports, mediation [was] to be conducted." Thus, although the February 8, 2017 order stated that the parties were to conduct mediation after reviewing their respective expert witness disclosures, it in no way stated that Davis' expert witness disclosure deadline was for mediation purposes only.

20

More significantly, this court's rules on interpreting court orders entirely undermines Davis' contention that the February 8, 2017 order requiring her to disclose her expert witnesses by February 15, 2017, created an expert witness disclosure deadline for mediation purposes only. "The primary rule in interpreting written instruments is to ascertain the intent of the parties, and thus, in interpreting an order the primary rule is to ascertain the intent of the court." *Einsel*, 304 Kan. at 581. When the intent of the court is unambiguous, an appellate court must interpret the language of the disputed court order as written. 304 Kan. at 581. "If, however, the order is ambiguous, this court applies the same rules of construction as for any other written instrument." *In re Marriage of Gerleman*, 56 Kan. App. 2d 578, 589, 435 P.3d 552 (2018) (citing *Einsel*, 304 Kan. at 581).

Here, because the trial court's February 8, 2017 order did not tie Davis' February 15, 2017 expert witness disclosure deadline to mediation, the trial court's February 8, 2017 order was unambiguous. For this reason alone, we reject Davis' contention that the February 8, 2017 order requiring her to disclose her expert witnesses by February 15, 2017, created an expert witness disclosure deadline for mediation purposes only.

As a further observation on this matter, we note attorney Bergmann's role as counsel for Davis and drafter of the February 8, 2017 order. Thus, even if the trial court's February 8, 2017 order contained an ambiguity that somehow indicated that Davis' February 15, 2017 expert witness disclosure deadline was a deadline for mediation purposes only, we still reject Davis' interpretation of the February 8, 2017 order. As previously noted, when a court order is ambiguous, this court applies the same rules of construction associated with interpreting other written instruments to determine the meaning of the ambiguous court order language. *In re Marriage of Gerleman*, 56 Kan. App. 2d at 589. So this court may look to the rules of contract construction to determine the meaning of ambiguous court order language. See *Einsel*, 304 Kan. at 581 (relying on

21

*Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 921, 46 P.3d 1120 [2002], a contract construction case, interpreting the meaning of a court order).

Thus, even if Davis were to argue that the February 8, 2017 order is ambiguous and should be interpreted in her favor, the argument would be unavailing because it is a basic principal of contract interpretation that ambiguous language contained in an order is to be interpreted against the drafter. See *Liggatt*, 273 Kan. at 921.

In turn, under our rules of court-order interpretation, there is no way to construe the trial court's February 8, 2017 order as creating the February 15, 2017 expert witness disclosure deadline for mediation purposes only.

Notwithstanding the preceding, however, other problems exist with Davis' argument. For instance, Davis' contention that the February 15, 2017 expert witness disclosure deadline was for mediation purposes only becomes more suspect when we compare Bergmann's statements to the trial court at the January 23, 2017 hearing, to the contents of Davis' February 15, 2017 expert witness disclosure.

To review, at the January 23, 2017 hearing, Bergmann told the trial court the following: (1) that the Mayo physicians were "always a little hesitant to provide expert opinions on one way or another as far as a formal report"; (2) that "[their] methodology right now [was] to use . . . the treating medical records from the Mayo physician as a basis for [their] expert; and (3) that "[he did not] see [them] going out and wasting more time and trying to engage another expert." Bergmann further told the trial court that "[they] would have to depose [the Mayo physician] prior to trial," and later, "try to work through the Mayo records and get that in to support our position." When the trial court questioned Bergmann about this planned strategy because "you have to have an expert to testify . . . in a medical malpractice case," Bergmann agreed with the trial court that Davis needed expert witness testimony at trial. Even so, after agreeing with the trial

22

court, Bergmann repeated that "[he] believe[d] the treating records [could] suffice for the written records and then have the physician—the treating physician from Mayo testify through a deposition . . . for expert purposes."

Then, when Bergmann filed Davis' February 14, 2017 expert witness disclosure, he listed Dr. Leung as Davis' expert witness while also including vague language about what Dr. Leung would testify about. That is, the disclosure that Bergmann filed on Davis' behalf did not explicitly state that Dr. Leung would testify about Dr. Estephan's alleged noncompliance with the applicable medical standard of care when diagnosing Davis with symptomatic multiple myeloma. And Bergmann did not attach to the disclosure a report from Dr. Leung stating that Dr. Estephan misdiagnosed Davis with symptomatic multiple myeloma.

As a result, in drafting Davis' February 14, 2017 expert witness disclosure, Bergmann did exactly what he told the trial court he was going to do during the January 23, 2017 hearing: He listed Dr. Leung, the treating Mayo physician, as an expert witness without attaching a "formal report" from Dr. Leung "provid[ing] expert opinions on one way or another" about Dr. Estephan's alleged noncompliance with the applicable medical standard of care when diagnosing Davis with symptomatic multiple myeloma.

In short, Bergmann's decision to follow through on his expert witness strategy as explained to the trial court at the January 23, 2017 hearing in Davis' February 14, 2017 expert witness disclosure reveals that Bergmann believed Davis' February 14, 2017 expert witness disclosure was sufficient for trial purposes.

Also, Dr. Estephan correctly points out in his brief that Davis has never argued that K.S.A. 2019 Supp. 60-226 supports her contention that the trial court made the February 15, 2017 expert witness disclosure deadline for mediation purposes only. Besides, Davis has never argued that her January 23, 2018 disclosure of Dr. Hurwitz as

23

her expert witness constituted a supplemental disclosure that corrected materially incorrect information in her timely February 14, 2017 disclosure of Dr. Leung as her expert witness as stated under K.S.A. 2019 Supp. 60-226(e)(1)(A). In turn, Davis has abandoned her ability to make such arguments on appeal. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018) (holding that an issue not briefed by an appellant is deemed waived and abandoned).

Yet, even if Davis had made such arguments on appeal, those arguments would not be supported by the plain language of K.S.A. 2019 Supp. 60-226(b)(6)(C) or (e)(1)(A). K.S.A. 2019 Supp. 60-226(b)(6)(C) clearly states that a party "must make" any expert witness disclosures under subsection (b)(6) "at the times and in the sequence that the court orders." Further, K.S.A. 2019 Supp. 60-226 contains no provision discussing rules for an expert witness disclosure deadline that exists for mediation purposes only. Indeed, as the trial court indicated while rejecting Davis' argument below, there seems to be no precedent for having an expert witness disclosure deadline for mediation purposes only.

As for K.S.A. 2019 Supp. 60-226(e)(1)(A)'s application, K.S.A. 2019 Supp. 60-226(e)(1)(A) requires any party who has made an expert witness disclosure under subsection (b)(6) to supplement or correct their disclosure if the party learns that the disclosure contains materially incorrect information. Yet, when she filed her January 23, 2018 disclosure, Davis sought to disclose an entirely new expert witness. Because Davis sought to disclose an entirely new expert witness, that is, Dr. Hurwitz, in her January 23, 2018 disclosure, one cannot reasonably construe this disclosure as a supplemental disclosure correcting materially incorrect information included in her timely February 14, 2017 disclosure.

24

Finally, Davis asserts that the trial court's lack of complete case management order supports that the trial court's February 15, 2017 expert witness disclosure deadline was a deadline for mediation purposes only.

Yet, Davis' argument ignores that even if the trial court never completed a case management order outlining each discovery-related deadline, on October 21, 2016, the trial court entered a status conference order that required Davis to disclose her expert witnesses by December 15, 2016. Davis then requested and was granted an extension of this deadline. In the trial court's order on Davis' motion for an extension, which Bergmann drafted, the trial court ruled that it was extending Davis' expert witness disclosure deadline to February 15, 2017.

Thus, the trial court issued an order clearly stating that Davis' expert witness disclosure deadline was February 15, 2017. Because this order existed, it is irrelevant that the trial court had not completed a case management order outlining each discovery-related deadline.

In summary, the record on appeal does not support Davis' argument that the trial court's February 15, 2017 expert witness disclosure deadline was an expert witness disclosure deadline for mediation purposes only. The trial court's comments about Davis' expert witness disclosure deadline at the January 23, 2017 hearing, as well as the plain language of the trial court's February 8, 2017 order stating that Davis' expert witness disclosure deadline was February 15, 2017, establish that this deadline was a final deadline. Yet, even if this court assumed for argument sake that the February 8, 2017 order contained some ambiguity regarding the February 15, 2017 expert witness disclosure deadline, because Bergmann drafted the February 8, 2017 order, we reject construing that ambiguity in this way to make the February 15, 2017 expert witness disclosure deadline as a deadline for only mediation purposes.

25

Based on the preceding, the trial court's February 15, 2017 expert witness disclosure deadline constituted a final expert witness disclosure deadline as opposed to an expert witness disclosure deadline for mediation purposes only. This means that Davis' January 23, 2018 disclosure listing Dr. Hurwitz as her expert witnesses was untimely because Davis filed the disclosure nearly a year after the trial court's February 15, 2017 expert witness disclosure deadline. In turn, to establish that the trial court erred by rejecting her belated disclosure of Dr. Hurwitz as her expert witness, Davis must establish that her failure to timely identify Dr. Hurwitz as her expert witness as required under K.S.A. 2019 Supp. 60-226(b)(6)(C) was either "substantially justified or is harmless" as stated under K.S.A. 2019 Supp. 60-237(c)(1).

*Belated Disclosure Properly Rejected*

To review, in her alternative argument, Davis contends that even if her January 23, 2018 disclosure of Dr. Hurwitz as her expert witness was untimely, the trial court should have accepted her belated disclosure because doing so would not have prejudiced Dr. Estephan. In making this argument, Davis contends that she filed the January 23, 2018 disclosure of Dr. Hurwitz as her expert witness "as soon as reasonably possible." She also contends that this court's previous decisions in *Canaday v. Midway Denton U.S.D. No. 433*, 42 Kan. App. 2d 866, 874, 218 P.3d 446 (2009), *George v. Pauly*, 30 Kan. App. 2d 444, 453-54, 45 P.3d 1 (2001), and *West v. Martin*, 11 Kan. App. 2d 55, 58, 713 P.2d 957 (1986)—where this court held that the trial court abused its discretion by either barring the plaintiff's key witness from testifying at trial or limiting the testimony of plaintiff's key witness at trial— show that the trial court abused its discretion by rejecting her January 23, 2018 disclosure of Dr. Hurwitz as her expert witness even if the disclosure was untimely.

Nevertheless, Davis' contention that she disclosed Dr. Hurwitz as her expert witness "as soon as reasonably possible" is unpersuasive. To review, Dr. Estephan moved

26

for summary judgment on September 5, 2017. Davis moved to disclose a new expert witness on November 22, 2017. Then, Davis filed her disclosure listing Dr. Hurwitz as her expert witness on January 23, 2018. Because Dr. Hurwitz also executed his sworn affidavit stating that he would now serve as Davis' expert witness on January 23, 2018, it seems unlikely that Davis obtained Dr. Hurwitz' consent to list him as an expert witness in her disclosure much before January 23, 2018.

Simply put, Davis should have sought to disclose Dr. Hurwitz as her expert witness as soon as she learned that her February 14, 2017 disclosure of Dr. Leung as her expert witness was deficient. But she did not. Instead, she waited over two months after Dr. Estephan moved for summary judgment to disclose a new expert witness. She then seemingly waited another two months between moving to disclose a new expert witness and obtaining Dr. Hurwitz' consent to file the disclosure listing him as her expert witness.

Next, the *Canaday*, *George*, and *West* decisions do not support Davis' contention that the trial court's acceptance of her untimely disclosure of Dr. Hurwitz as her expert witness would not have prejudiced Dr. Estephan. In fact, those decisions vividly illustrate that the trial court's acceptance of Davis' untimely disclosure would have harmed Dr. Estephan.

For starters, the *Canaday* decision involved a plaintiff who was suing a school district that employed a teacher who allegedly sexually abused him as a child. As part of the trial court's summary judgment ruling in favor of the school district, the trial court granted the school district's request to strike several of the plaintiff's witnesses, including witnesses who observed evidence of sexual abuse, because the plaintiff had not included those witnesses on his witness list until after discovery had closed.

The plaintiff appealed the decision to this court, and this court reversed. Specifically, this court reversed the trial court because in its previous case management

orders, the trial court never ordered the plaintiff to disclose his final witness list by a certain date. Absent an order requiring plaintiff to disclose his final witness list by a certain date, this court determined that the trial court abused its discretion by striking the witnesses the plaintiff added to his witness list after the completion of discovery. 42 Kan. App. 2d at 872-73. This court then held that the trial court had an obligation to "weigh the relative prejudice to each party" when deciding whether to strike witnesses. 42 Kan. App. 2d at 873. Finally, this court explained that when deciding whether the trial court abused its discretion, the following factors adopted by the Third and Tenth Circuit Courts of Appeals were instructive:

> """(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order.'" [Citation omitted.]" 42 Kan. App. 2d at 873-74.

In her brief, Davis argues that this court should rely on the factors that the *Canaday* court adopted from the Third and Tenth Circuit Courts of Appeals when deciding whether the trial court abused its discretion by rejecting her January 23, 2018 disclosure of Dr. Hurwitz as her expert witness. She then argues that the trial court in her case abused its discretion by rejecting her January 23, 2018 disclosure of Dr. Hurwitz as her expert witness because Dr. Estephan could not have been prejudiced or surprised by her belated disclosure.

Nevertheless, Davis' argument ignores that the *Canaday* case did not involve the filing of expert witness disclosures under K.S.A. 60-226(b)(6)(C). Instead, the *Canaday* decision involved whether the trial court abused its discretion by striking plaintiff's disputed witnesses when the trial court's previous case management orders, made in accordance with K.S.A. 60-216(b), lacked a specific deadline regarding the plaintiff's final witness list. 42 Kan. App. 2d at 872. Clearly, this makes the *Canaday* case

28

distinguishable from Davis' case because this case involves the application of K.S.A. 2019 Supp. 60-226(b)(6)(C) and K.S.A. 2019 Supp. 60-237(c)(1), which provide specific guidance regarding expert witness disclosure deadlines and the consequences of not complying with those expert witness disclosure deadlines, respectively.

Also, Davis' argument that her case is comparable to the *Canaday* case ignores that this court's reversal of the trial court's decision to exclude the disputed witnesses in *Canaday* hinged on the trial court's failure to issue a case management order that included a final deadline to disclose new witnesses. 42 Kan. App. 2d at 872-73. As developed in the preceding section, the trial court in this case clearly ordered Davis to disclose her expert witnesses no later than February 15, 2017. So, notwithstanding the fact that the *Canaday* case does not involve expert witness disclosure deadlines, the *Canaday* case is also distinguishable from Davis' case because in Davis' case, the trial court had an order addressing Davis' final expert witness disclosure deadline.

As for the *George* and the *West* cases, in both cases, this court held that the trial court erred by barring the respective plaintiffs' expert witnesses from testifying. Specifically, this court held that the trial courts in the *George* and the *West* cases erred because even though the plaintiffs in those cases had not entirely followed the applicable medical expert witness disclosure rules, during discovery, the plaintiffs had put the defendants on notice that they intended to call the disputed expert witnesses. *George*, 30 Kan. App. 2d at 452; *West*, 11 Kan. App. 2d at 58.

Thus, unlike the *Canaday* case, the *George* and the *West* cases involved the trial court's exclusion of the plaintiffs' expert witnesses based on the plaintiffs' expert witness disclosure issues. Nevertheless, Davis' reliance on the *George* and the *West* cases is misplaced. In making her arguments, Davis ignores that our Legislature has made significant amendments regarding expert witness disclosures since this court decided the *George* case in 2001 and the *West* case in 1986.

29

To begin with, our Legislature adopted the substantive portion of K.S.A. 60-226(b)(6)(C)'s time limitation on expert witness disclosures in 1997. See L. 1997, ch. 173, § 11. Before the 1997 amendment, K.S.A. 60-226(b) contained no time limitations on expert witness disclosures. Instead, this earlier version of K.S.A. 60-226(b) merely provided that parties may discover the identity and planned testimony of the opposing party's expert witness through interrogatories. See 1997, ch. 173, § 11; L. 1986, ch. 215, § 6. Next, our Legislature did not enact the substantive portion of K.S.A. 60-237(c)(1)'s rule excluding a party's expert witness from testifying at trial based on the party's failure to disclose the expert witness in accordance with K.S.A. 60-226(b)(6) or (e) until 2010. See L. 2010, ch. 135, § 106.

As a result, when this court decided *West*, our Legislature had not yet enacted any of the substantive rules at issue in this case. And when this court decided *George*, our Legislature had not yet enacted K.S.A. 2019 Supp. 60-237(c)(1)'s rule excluding a party's expert witness from testifying at trial based on the party's failure to disclose the expert witness in accordance with K.S.A. 2019 Supp. 60-226(b)(6) or (e). Therefore, although the *George* and the *West* decisions seem somewhat comparable to Davis' case at first glance, the law on expert witness disclosures has materially changed since this court issued the *George* and the *West* decisions. Thus, the *George* and the *West* decisions have no bearing on the outcome of this case.

So, to summarize, Davis makes two arguments why the trial court erred by rejecting her January 23, 2018 disclosure of Dr. Hurwitz as her expert witness under the assumption that this disclosure was untimely. She first argues that she moved to disclose Dr. Hurwitz "as soon as reasonably possible." She then argues that the *Canaday*, *George*, and *West* decisions support that the trial court should have accepted her January 23, 2018 disclosure of Dr. Hurwitz as her expert witness even if the disclosure was untimely. But the record does not support Davis' argument that she moved to disclose Dr. Hurwitz as

her expert witness as soon as reasonably possible. And for various reasons, the *Canaday*, *George*, and *West* cases are distinguishable from Davis' case. So both of Davis' arguments why the trial court abused its discretion by rejecting her untimely January 23, 2018 disclosure of Dr. Hurwitz as her expert witness are unpersuasive.

At this juncture, we note that Davis ends her analysis on this issue by asserting that "[Dr.] Estephan has failed to show that he [was] prejudiced or surprised by [her] request to identify [Dr.] Hurwitz as an expert for trial, let alone show an issue which could not have been easily cured by [her]." The obvious problem with this argument is that Davis, not Dr. Estephan, must prove that the trial court abused its discretion. See *Gannon*, 305 Kan. at 868 (holding that the party alleging that the trial court abused its discretion carries the burden of proof). Further, as noted several times already, under K.S.A. 2019 Supp. 60-237(c)(1), Davis must establish that her belated disclosure of Dr. Hurwitz as her expert witness was either substantially justified or is harmless.

Yet, the arguments Davis has included in her brief do not establish that her belated disclosure of Dr. Hurwitz as her expert witness was substantially justified or is harmless. Indeed, the record on appeal strongly indicates that Davis' belated disclosure of Dr. Hurwitz as her expert witness was the result of Bergmann's failings. And the record on appeal also strongly indicates that had the trial court accepted Davis' belated disclosure of Dr. Hurwitz as her expert witness, the trial court would have harmed Dr. Estephan. Undoubtedly, the trial court's acceptance of Davis' belated disclosure would have further delayed the resolution of Davis' malpractice claims against Dr. Estephan, which had already been pending over three years when Davis filed her untimely January 23, 2018 disclosure listing Dr. Hurwitz as her expert witness. Also, the trial court's acceptance of Davis' belated disclosure would have entirely nullified the basis of Dr. Estephan's summary judgment motion.

31

For the preceding reasons, we conclude that the trial court did not abuse its discretion by rejecting Davis' untimely January 23, 2018 disclosure of Dr. Hurwitz as her expert witness. As a result, in this respect, we affirm the decision of the trial court.

*Did the Trial Court Err by Granting Dr. Estephan's Motion for Summary Judgment?*

Davis' remaining arguments concern whether the trial court erred by granting Dr. Estephan's summary judgment motion. Davis asserts that the trial court erred by granting Dr. Estephan's summary judgment motion because in doing so, it ignored Dr. Hurwitz' opinion that Dr. Estephan deviated from the applicable medical standard of care when diagnosing her with symptomatic multiple myeloma.

Davis further asserts that the trial court erred by granting Dr. Estephan's summary judgment motion because everyone, including Dr. Estephan, agreed on the following: (1) that the applicable medical standard of care when diagnosing a person with either symptomatic or asymptomatic multiple myeloma is the existence of at least one CRAB symptom, and (2) that she did not have high calcium levels when Dr. Estephan diagnosed her with symptomatic multiple myeloma. Davis contends that the trial court should have relied on Dr. Estephan's admissions as evidence of negligence, which a jury could consider even if she had no expert witness who could testify on her behalf. Finally, Davis argues that the trial court erred by granting Dr. Estephan's summary judgment motion because the parties had not yet completed discovery when the trial court granted the motion. Davis contends that at the very least, he should have been allowed to depose Dr. Hurwitz and Dr. Estephan's expert witness, Dr. Mitchell R. Smith, before the trial court ruled on Dr. Estephan's summary judgment motion.

32

*Applicable Law*

Our Supreme Court has consistently held that "'[e]xpert testimony is generally required in medical malpractice cases to establish the applicable standard of care and to prove causation, except where lack of reasonable care or existence of proximate cause is apparent to an average layperson from common knowledge or experience.'" *Biglow*, 308 Kan. at 887-88 (quoting *Puckett*, 290 Kan. at 435-36). Thus, plaintiffs in medical malpractice cases must establish a doctor's negligence through expert testimony unless the common knowledge and experience exception applies. The common knowledge and experience exception applies "if what is alleged to have occurred in the diagnosis, treatment, and care of a patient [was] so obviously lacking in reasonable care and the results are so bad that the lack of reasonable care would be apparent to and within the common knowledge and experience of mankind generally." *Hubbard v. Mellion*, 48 Kan. App. 2d 1005, 1015, 302 P.3d 1084 (2013).

As a result, absent the application of the common knowledge and experience exception, a plaintiff must prove the following through expert witness testimony in a medical malpractice case: "(1) that a duty was owed by the physician to the patient; (2) that the duty was breached; and (3) that a causal connection existed between the breached duty and the injuries sustained by the patient." *Wozniak* 242 Kan. at 587.

When considering a trial court's ruling on a summary judgment motion, an appellate court applies the same standard of review as the trial court:

> "'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come

33

forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. [Citations omitted.]'" *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018).

*Summary Judgment Properly Granted*

Davis' summary judgment arguments chiefly hinge on her contention that Dr. Estephan agrees with the following propositions: (1) that the applicable medical standard of care when diagnosing a person with symptomatic multiple myeloma is the existence of at least one CRAB criteria, and (2) that she did not have high calcium levels when he diagnosed her with symptomatic multiple myeloma. Davis seemingly contends that because Dr. Estephan agrees that he diagnosed her with symptomatic multiple myeloma without having high calcium levels, Dr. Estephan has conceded that he did not comply with the CRAB criteria standard of care. According to Davis, this means that a jury could consider her medical malpractice claim without having an expert witness explicitly testify that Dr. Estephan deviated from the applicable medical standard of care when diagnosing her with symptomatic multiple myeloma.

But in making this argument, Davis never cites to the caselaw establishing that plaintiffs must prove their medical malpractice claims through expert witness testimony absent the existence of a common knowledge and experience exception. Nor does she ever explicitly allege that she is making a common knowledge and experience exception argument. In turn, because Davis has not argued that a common knowledge and experience exception applies to her case, she has abandoned her ability to argue that such an exception exists. See *In re Marriage of Williams*, 307 Kan. at 977 (holding that an issue not briefed by an appellant is deemed waived and abandoned); see also *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d

34

602 (2015) (holding that failure to support a point with pertinent authority is akin to failing to brief the issue).

Regarding Davis' contention that Dr. Estephan agrees that the existence of at least one of the CRAB criteria constitutes the applicable medical standard of care when diagnosing a person with symptomatic multiple myeloma, Davis has twisted Dr. Estephan's deposition testimony. Indeed, during his deposition, Dr. Estephan explicitly stated that the existence of at least one of the CRAB criteria was not the only criteria a doctor evaluates when diagnosing a person with either symptomatic or asymptomatic multiple myeloma. Dr. Estephan went on to discuss some of the other criteria that a doctor might rely on to diagnose a person with symptomatic or asymptomatic multiple myeloma. Thus, there is simply no merit to Davis' contention that Dr. Estephan agrees that the existence of at least one CRAB symptom, in and of itself, is the applicable medical standard of care when diagnosing a person with symptomatic multiple myeloma.

As to Davis' contention that Dr. Estephan agrees that he diagnosed her with symptomatic multiple myeloma without having elevated calcium levels, Davis has ignored certain facts as it pertains to her calcium levels. Davis questions Dr. Estephan's symptomatic multiple myeloma diagnosis because the medical tests Dr. Estephan performed on her did not indicate that she had elevated calcium levels. What Davis fails to disclose, however, is that when Dr. Estephan diagnosed her with symptomatic multiple myeloma, she self-reported that her calcium levels were high and Davis' medical reports from her other doctors stated that her calcium levels were high. Also, in making her argument, Davis ignores that when Dr. Estephan diagnosed her with symptomatic multiple myeloma, she had recently received a steroid injection. During his deposition testimony, Dr. Estephan explained that the steroid injection was known to lower high calcium levels.

As a result, while Dr. Estephan agreed that the medical tests he performed on Davis did not indicate that she currently suffered from high calcium levels, other evidence indicated that Davis had high calcium levels that were being controlled by medicine. Based on the preceding facts, Davis cannot successfully argue that Dr. Estephan conceded that he diagnosed her with symptomatic multiple myeloma without exhibiting at least one of the CRAB criteria.

Thus, even if this court were to assume that Davis' current arguments about Dr. Estephan's alleged concessions constitute common knowledge and experience exception arguments, Davis has not established that the common knowledge and experience exception applies in her case. In short, the record on appeal undermines Davis' contention that Dr. Estephan somehow conceded his negligence either by agreeing to the applicable medical standard of care or by agreeing that he diagnosed her with symptomatic multiple myeloma without having high calcium levels.

Of additional note, the deposition testimony of Dr. Estephan and Dr. Leung establish that diagnosing a person with either symptomatic or asymptomatic multiple myeloma is a complex determination based on criteria that are not easily grasped by lay people without expert witness testimony. Simply put, the complexity of a symptomatic multiple myeloma diagnosis establishes that for plaintiffs to prove that a doctor negligently diagnosed them with symptomatic multiple myeloma, plaintiffs must support their medical malpractice claim with expert testimony. Thus, notwithstanding any of Davis' other arguments, the common knowledge and experience exception would not apply under the facts of her case.

Finally, Davis' argument that the trial court erred when granting Dr. Estephan's summary judgment motion because the parties had not completed discovery is also unpersuasive. Davis seemingly contends that the trial court should have allowed the parties to depose Dr. Smith before granting summary judgment because Dr. Smith may

36

have provided her with evidence supporting Dr. Estephan's negligence. Yet, as Dr. Estephan emphasizes in his brief, Dr. Smith was his expert witness. Dr. Smith's expert report establishes that had Dr. Smith been deposed, he would have testified that Dr. Estephan complied with the applicable medical standard of care. Because Dr. Smith was Dr. Estephan's expert witness, the trial court had no duty to require Dr. Smith's deposition before ruling on Dr. Estephan's summary judgment motion.

In summary, because of Davis' failure to timely disclose an expert witness who would testify that Dr. Estephan had deviated from the applicable medical standard of care when diagnosing her with symptomatic multiple myeloma, Davis had no expert witness who could testify on her behalf at trial. Also, for reasons discussed in the preceding paragraphs, the common knowledge and experience exception does not apply in Davis' case.

In addition, our Supreme Court precedent clearly provides that plaintiffs must prove their medical malpractice claims through expert witness testimony absent the application of the common knowledge and experience exception. See *Biglow*, 308 Kan. at 887-88. This court is duty bound to follow our Supreme Court's precedent absent some indication that our Supreme Court is moving away from that precedent. *Majors v. Hillebrand*, 51 Kan. App. 2d 625, 629-30, 349 P.3d 1283 (2015). Here, there is no indication that our Supreme Court is moving away from its holding that absent the application of a common knowledge and experience exception, plaintiffs must establish their medical malpractice claims through expert witness testimony. As a result, we are duty bound to follow our Supreme Court precedent that plaintiffs must establish their medical malpractice claims through expert witness testimony absent the application of the common knowledge and experience exception.

In turn, Davis' failure to timely disclose an expert witness who would testify that Dr. Estephan deviated from the applicable medical standard of care was fatal because it

37

meant that she had no expert witness who could testify about Dr. Estephan's alleged noncompliance with the applicable medical standard of care at trial. Thus, we conclude that the trial court properly granted Dr. Estephan's summary judgment motion because Davis could not legally establish her medical malpractice claim against Dr. Estephan.

Affirmed.